# 26-2079

## United States Court of Appeals for the Second Circuit

UBER TECHNOLOGIES, INC. AND UBER USA, LLC,

*Plaintiffs-Appellees*,

*against*

CITY OF NEW YORK,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Southern District of New York

## BRIEF FOR APPELLANT

STEVEN BANKS
*Corporation Counsel of the City of New York*
100 Church Street
New York, New York 10007
212-356-4378
mfillow@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
MACKENZIE FILLOW
*of Counsel*

September 14, 2026

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES........................................................iii

PRELIMINARY STATEMENT.....................................................1

JURISDICTIONAL STATEMENT ...............................................4

ISSUES PRESENTED...............................................................4

STATEMENT OF THE CASE.....................................................5

A. The City Council's investigation into Uber's and Lyft's deactivation policies and their effect on drivers................5

B. The City Council's enactment of the Deactivation Law to protect drivers from wrongful deactivation.....................12

C. This proceeding ..........................................................15

1. The complaints alleging that the law impaired the companies' contracts with drivers ..............................15

2. The district court's decision preliminarily enjoining enforcement of the law in its entirety .........................17

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT.....21

ARGUMENT...........................................................................27

POINT I .................................................................................27

THE DISTRICT COURT ABUSED ITS DISCRETION IN GRANTING A PRELIMINARY INJUNCTION ....................27

A. The companies failed to show irreparable harm. ............27

B. The court erred in finding that Uber and Lyft were likely to succeed on the merits of their facial Contract Clause claims...................................................................29

## TABLE OF CONTENTS (cont'd)

**Page**


1. There are many instances where the law would not substantially impair the companies' right to deactivate drivers. ....33

   a. The companies remain free to deactivate drivers in a broad range of circumstances. ....34

   b. The companies could not have reasonably expected the City to refrain from regulating in this area. 39

   c. The companies can safeguard their right to deactivate drivers by documenting their decisions. 47

2. The Deactivation Law survives Contract Clause scrutiny. ....48

   a. The City has a legitimate interest in protecting drivers from unfair deactivation. ....49

   b. The City is entitled to deference on the need for the law, and the record shows the law was reasonable. ....55

C. The balance of equities and the public interest strongly weigh against enjoining the law. ....63

POINT II ....64

IN THE ALTERNATIVE, THE INJUNCTION IS OVERLY BROAD ....64

CONCLUSION ....67

CERTIFICATE OF COMPLIANCE ....68

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*,
924 F.2d 1247 (2d Cir. 1991) ........................................................ 31

*Alliance of Auto Mfrs., Inc. v. Currey*,
610 F. App'x 10 (2d Cir. 2015) ........................................................ 40

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978)........................................................................ 40, 42

*Almontaser v. NYC Dep't of Educ.*,
519 F.3d 505 (2d Cir. 2008) ........................................................... 27

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) ........................................................... 63

*Ass'n of Car Wash Owners v. City of N.Y.*,
911 F.3d 74 (2d Cir. 2018) ............................................................ 51

*Ass'n of Equip. Manufacturers v. Burgum*,
932 F.3d 727 (8th Cir. 2019) ........................................................... 55

*Barrett v. State of Indiana*,
229 U.S. 26 (1913).......................................................................... 51

*Buffalo Teachers Fed. v. Tobe*,
464 F.3d 362 (2d Cir. 2006) ........................................................... 30

*City of El Paso v. Simmons*,
379 U.S. 497 (1965)........................................................................ 31

*City of N.Y. v. Mickalis Pawn Shop*,
645 F.3d 114 (2d Cir. 2011) ........................................................... 64

*Cmty. Hous. Improvmt. Program. v. City of N.Y.*,
59 F.4th 540 (2d Cir. 2023) ...................................................... 23, 30

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025) ...................................................... 40, 50

*Concerned Home Care Providers, Inc. v. Cuomo*,
783 F.3d 77 (2d Cir. 2015) ............................................................ 51

*Conely v. Barton*,
260 U.S. 677 (1923)........................................................................ 37

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Conn. State Police v. Rovella*,
36 F.4th 54 (2d Cir. 2022) .......... 56

*Curtis v. Whitney*,
13 Wall. 68 (1872) .......... 37

*Donohue v. Cuomo*,
980 F.3d 53 (2d Cir. 2020) .......... 38, 40, 46

*Exxon Corp. v. Eagerton*,
462 U.S. 176 (1983) .......... 31

*Figueroa v. Foster*,
864 F.3d 222 (2d Cir. 2017) .......... 49

*Gen. Elec. Co. v. N.Y. State Dep't of Labor*,
936 F.2d 1448 (2d Cir. 1991) .......... 66

*Gen. Media Comm'ns, Inc. v. Cohen*,
131 F.3d 273 (2d Cir. 1997) .......... 55

*Harmon v. Markus*,
412 F. App'x 420 (2d Cir. 2011) .......... 31, 65

*Home Bldg. & Loan Ass'n v. Blaisdell*,
290 U.S. 398 (1934) .......... 41

*Hudson Shore Assocs. Ltd. P'ship v. N.Y.*,
139 F.4th 99 (2d Cir. 2025) .......... 23, 36, 47

*John Doe, Inc. v. Mukasey*,
549 F.3d 861 (2d Cir. 2008) .......... 59, 66

*JTH Tax, LLC v. Agnant*,
62 F.4th 658 (2d Cir. 2023) .......... 27, 29

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987) .......... 55

*Maryland v. King*,
567 U.S. 1301 (2012) .......... 63

*Melendez v. City of N.Y.*,
16 F.4th 992 (2d Cir. 2021) .......... *passim*

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*Moody v. NetChoice*,
603 U.S. 707 (2024) .......... 36

*Nat'l Ass'n for Gun Rights v. Lamont*,
153 F.4th 213 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (June 30, 2026) .......... 28

*Nekrasov v. City of Jersey City*,
45 F.4th 662 (3d Cir. 2022) .......... 55

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 63

*NLRB v. SW Gen., Inc.*,
580 U.S. 288 (2017) .......... 43

*Olson v. Cal.*,
104 F.4th 66 (9th Cir. 2024) .......... 42, 46, 50

*Orange Lake Assocs., Inc. v. Kirkpatrick*,
21 F.3d 1214 (2d Cir. 1994) .......... 59

*Principle Homecare, LLC v. McDonald*,
158 F.4th 326 (2d Cir. 2025) .......... 39, 48

*Progressive Credit Union v. City of N.Y.*,
889 F.3d 40 (2d Cir. 2018) .......... 40

*Real Estate Bd. of N.Y., Inc. v. City of N.Y.*,
182 F.4th 140 (2d Cir. 2026) .......... *passim*

*Rest. Law Ctr. v. City of N.Y.*,
90 F.4th 101 (2d Cir. 2024) .......... 12, 49, 51

*RUI One Corp. v. City of Berkeley*,
371 F.3d 1137 (9th Cir. 2004) .......... 50

*Stockholders of Peoples Banking Co. v. Sterling*,
300 U.S. 175 (1937) .......... 32

*Sveen v. Melin*,
584 U.S. 811 (2018) .......... 37, 38, 47

*Texaco Inc. v. Short*,
454 U.S. 516 (1982) .......... 32, 47

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Thornhill v. State of Alabama*,
310 U.S. 88 (1940) .......... 49

*Matter of Tri-City v. N.Y.C. Taxi & Limousine Comm'n*,
189 A.D.3d 652 (1st Dep't 2020) .......... 42

*U.S. Trust Co. v. New Jersey*,
431 U.S. 1 (1977) .......... 48

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 23

*Upsolve, Inc. v. James*,
155 F.4th 133 (2d Cir. 2025) .......... 49

*Veix v. Sixth Ward Bldg. & Loan*,
310 U.S. 32 (1940) .......... 31, 65

*Victorinox AG v. B&F Sys.*,
709 F. App'x 44 (2d Cir. 2017) .......... 64

*West Coast Hotel v. Parrish*,
300 U.S. 379 (1937) .......... 30, 49

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 28, 29, 63

*Zehn-NY LLC et al. v. City of N.Y.*,
2019 N.Y. Misc. LEXIS 5875 (Sup. Ct. Oct. 28, 2019) .......... 42

*Zehn-NY LLC et al. v. City of N.Y.*,
2019 N.Y. Misc. LEXIS 6789 (Sup. Ct. Dec. 23, 2019) .......... 42

**Statutes**

28 U.S.C. § 1292(a)(1) .......... 4

28 U.S.C. § 1331 .......... 4

N.Y.C. Admin. Code § 1-105 .......... 59, 66

N.Y.C. Admin. Code § 19-549 .......... 5, 41

N.Y.C. Admin. Code § 20-927 .......... 5

N.Y.C. Admin. Code § 20-1208 .......... 60

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

N.Y.C. Admin. Code § 20-1281 .......... 35

N.Y.C. Admin. Code § 20-1282 .......... 12, 35, 36, 54, 57, 58, 59

N.Y.C. Admin. Code § 20-1283 .......... 14

N.Y.C. Admin. Code § 20-1285 .......... 36

N.Y.C. Admin. Code § 20-1287 .......... 13, 58

Minn. Statute § 181C.04 .......... 45

Revised Code of Washington 49.46.300 .......... 45

Seattle Mun. Code 143.2.50 .......... 45

**Regulations**

35 R.C.N.Y. § 59a .......... 40

35 R.C.N.Y. § 59d .......... 41

**Other Authorities**

Angel Au-Yeung, Uber Drivers Stage Protest Outside Uber CEO's House in San Francisco, *Forbes*, June 24, 2020 .......... 44

Anna Sanders, *Ride-sharing Companies Spent Over $1M Lobbying in NYC*, POST, Aug. 4, 2018 .......... 46

Asian Law Caucus, *Fired By an App*, Feb. 2023 .......... 7, 8, 9

Daniel Miller, *Uber cracking down on users who give bad ratings to get refunds*, FOX 4 KDFW, Nov. 15, 2023 .......... 8

Dara Kerr, *Uber drivers are losing their jobs over fake DUI complaints*, CNET, Mar. 16, 2020 .......... 8

Dara Khosrowshahi, *I am the CEO of Uber. Gig Workers Deserve Better*, N.Y. Times, Aug. 10, 2020 .......... 44

Elliot Njus, *Portland to Investigate Uber's Greyball Scheme to Thwart Regulators*, THE OREGONIAN, Mar. 6, 2017 .......... 46

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

James Surowiecki, *Gigs with Benefits*, The New Yorker, June 29, 2015 .......... 44

Katie Benner, *Uber Rolls Out App Improvements to Meet Driver Demands*, N.Y. Times, June 6, 2016 .......... 44

Michael Hiltzik, *U.K. Court Reaches Obvious Conclusion That Uber Drivers are Workers*, L.A. Times, Feb. 19, 2021 .......... 44

Noam Scheiber, *Uber Has a Union of Sorts, but Faces Doubts on Its Autonomy*, N.Y. TIMES, May 12, 2017, .......... 10

Preetika Rana, Uber, *Lyft Drivers Clash with Riders over Face Masks*, WALL ST. J. Mar. 10, 2022 .......... 8

Sharon Block, *What California Should Do Next to Help Uber Drivers*, Wash. Post, Sept. 13, 2019 .......... 44

Tina Bellon, *Uber, Lyft Have a California Playbook to Fight Proposed U.S. Rules on Workers*, REUTERS, May 3, 2021 .......... 46

Vanessa Romo, *Uber Drivers Are Not Employees, NLRB Rules*, NPR, May 15, 2019, .......... 45

## PRELIMINARY STATEMENT

Plaintiffs Uber Technologies, Inc. and Uber USA, LLC (together "Uber"), and Lyft, Inc. ("Lyft"), the two leading ride-sharing companies in New York City, have contracts letting them "deactivate" drivers—that is, prohibit them from driving passengers for the companies—without prior notice in various circumstances. After hearing extensive evidence that the deactivation process is neither transparent nor fair, and is sometimes discriminatory, the New York City Council enacted Local Law 52 of 2026 (the "Deactivation Law"). The Deactivation Law, in short, prohibits the companies from deactivating drivers in the City without just cause and requires them to give drivers notice and opportunity to respond before deactivation on allegations of minor misconduct or unsatisfactory job performance. The law permits immediate deactivation for drivers who commit "egregious misconduct" and certain other misconduct.

Before the law's effective date, the companies brought facial challenges under the Contract Clause of the U.S. Constitution, among other things, and sought preliminary injunctions. The U.S. District Court for the Southern District of New York (Woods, J.) imposed a sweeping preliminary injunction prohibiting the City from enforcing the law in its entirety. This Court should reverse.

The district court made multiple errors. First, the injunction is improper because the companies failed to demonstrate that irreparable harm was likely, rather than remote or speculative. They offered only unsubstantiated assertions about how limits on their right to deactivate could tarnish their reputations for safety. This Court may reverse on this basis alone.

Second, the district court wrongly concluded that the companies are likely to succeed on their Contract Clause claims. At the outset, all of Lyft's contracts post-date the law's enactment and therefore are beyond the reach of the Contract Clause. That's enough to reverse as to Lyft. More broadly, throughout its analysis, the court failed to properly apply the rigorous standard for a facial challenge, which requires the companies to show that the law is unconstitutional in every application.

For one thing, the companies didn't show that the law substantially impairs their contracts. The contracts govern all aspects of their relationships with drivers, and the deactivation provisions are just one term among many—and a term the companies claim to rely on infrequently. The provisions are not the essence of the parties' bargains, so any impact the law may have on deactivation does not substantially impair the contracts. Even more clearly, the facial challenges falter because the companies failed to show that the law substantially impairs

their right to deactivate drivers in all circumstances. The law's effect will vary across different situations, and the companies retain the right to deactivate drivers in many cases where the law would come into play. Moreover, because drivers have been asking the City to enact a law like this for many years, and the City enacted similar protections for workers in other industries, the law was foreseeable, which defeats the claims.

Separately, the law reasonably advances a legitimate public purpose. It protects vulnerable workers from potentially ruinous and unjust deactivations, ensuring a measure of due process and requiring fair and reasonable standards. The district court inexplicably found that protecting this category of workers is not a legitimate public interest, and it failed to defer to the City Council's determination that the law is an appropriate way to accomplish its goal. A proper analysis makes clear that the City has a legitimate interest in ensuring fair working conditions for drivers, and the law is a reasonable way to advance it.

Third, the companies failed to show that the balance of the equities and public interest favor them. The documented need to protect drivers from unfair, unchallengeable, and potentially financially devastating deactivations far outweighs the companies' speculation about hypothetical harms from having to deactivate drivers justly and transparently.

Finally, the injunction is significantly overbroad, prohibiting the City from enforcing the law even in instances where it would plainly be constitutional to do so. Most significantly, the court extended the injunction to contracts formed after the law's enactment in January 2026, even though the Contract Clause applies only to preexisting contracts. If this Court doesn't vacate the injunction completely, the Court should narrow it by correcting these errors.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. On July 21, 2026, the district court granted the companies' motions for a preliminary injunction and enjoined the City from enforcing the Deactivation Law. The City timely noticed an appeal on July 28, 2026. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1. Did the district court err in (1) finding that the companies established irreparable harm based on mere speculation, (2) determining that the companies were likely to succeed on their facial challenge under the Contract Clause, where the law will not substantially impair their contracts in many if not all instances and serves a legitimate purpose in a reasonable way, and (3) finding that the balance of equities and public interest favored an injunction?

2. In the alternative, is the preliminary injunction overbroad, where it prohibits the City from enforcing the law even in instances where it would unquestionably be constitutional to do so?

## STATEMENT OF THE CASE

### A. The City Council's investigation into Uber's and Lyft's deactivation policies and their effect on drivers

In recent years, the New York City Council has taken many steps to protect the City's most vulnerable workers. Perhaps most notably for this case, it passed a law in 2018 directing the City's Taxi and Limousine Commission (TLC) to set minimum pay standards for for-hire vehicle drivers. N.Y.C. Admin. Code § 19-549. And in 2021, it passed a law to protect fast-food workers from unfair firing or reduction of hours that served as a model for the legislation here. *Id*. § 20-1271 *et. seq*.

Other recent enactments required hiring parties to give independent contractors a written contract and timely payment for their work, N.Y.C. Admin. Code § 20-927 *et seq.*; required car washes to post a bond to cover wage payment claims, *id.* § 20-542; required fast-food and retail employers to use fair scheduling practices, *id.* §§ 20-1201, 20-1231, 20-1241, 20-1521; extended the City's anti-discrimination law to independent contractors and prohibited employers from asking applicants about their salary history, *id.* § 8-107(23) & (25); required

restaurants using food delivery apps to let the delivery workers use the bathroom, *id.* § 20-1527; directed the City's Department of Consumer and Worker Protection (DCWP) to enact rules regulating the pay of food delivery workers, *id.* § 20-1522(a)(3); and mandated that food and grocery delivery apps give customers the opportunity to provide gratuities, *id.* § 20-1522(b)(3).

As part of its efforts, the Council investigated the working conditions of Uber and Lyft drivers and learned the following (Uber Appendix ("UA") 1290-91; Lyft Appendix ("LA") 1679-80). As of the 2025 hearings, almost 90,000 people were driving for Uber or Lyft in New York City, and the companies treated them as independent contractors (UA1656; LA2045). Both companies required drivers to agree to certain terms to gain access to their apps (UA14; LA15, 75). At that time, these agreements permitted the companies to temporarily or permanently "deactivate" drivers—or prohibit them from using the app—without prior notice (UA1658; LA2047).

The Council heard extensive evidence that the deactivation process was neither transparent nor fair. According to surveys, approximately 70% of deactivated drivers were given no notice before their access to the platform was cut off (UA1660; LA2049), and they were often given no reason, either (UA1325, 1387, 1444-45, 1488;

LA1714, 1776, 1833-34, 1877).[1] Forty-two percent were told they were deactivated due to customer complaints, but they were usually not given details—not even the date or time of the ride in question (UA1660; LA2049).

The Council also heard evidence that customer complaints can be based on bias. According to TLC, 91% of Uber and Lyft drivers in the City were born outside the United States, and 86% were persons of color (UA1656; LA2045). Two thirds of drivers in one study reported experiencing discrimination, sexual harassment, or other forms of mistreatment by passengers (UA1659; LA2048). Yet half of those who experienced discriminatory treatment were reported to the rideshare company *by the passenger* (UA1659; LA2048). And statistics supported the theory that bias played a role in customer complaints, as drivers of color were more likely to be deactivated than white drivers (UA1659; LA2048).

Some passengers also submitted false complaints for other reasons (UA1661; LA2050). For example, some passengers became angry when drivers asked them to wear a mask during the Covid-19

[1] *See also* Asian Law Caucus, *Fired By an App* at 4, Feb. 2023 (describing survey showing that thirty percent of drivers were given no reason for deactivation), at https://perma.cc/X7XB-G9W8.

pandemic or refused to make illegal U-turns (UA1328, 1376, 1425, 1445, 1488, 1527; LA1717, 1765, 1814, 1834, 1877).[2] And the companies' refund policies encouraged some passengers to lodge false complaints to recoup the cost of their ride, a problem big enough that Uber itself claimed to be addressing it (UA1352, 1658-59; LA1741, 2047-48.[3]

The Council tried to determine exactly how widespread the problem of unjust deactivations was, questioning multiple witnesses (UA1204, 1240-41, 1247-48, 1291, 1368-69; LA1593, 1629-30, 1636-37, 1680, 1757-58). Uber reported that it permanently deactivated approximately one percent of its New York City drivers each year but did not disclose how many drivers it was deactivating for shorter periods (UA1337; LA1726). Lyft provided no numbers at all. One study showed that two-thirds of drivers had experienced some form of deactivation.[4] DCWP believed about 13,000 New York City drivers were deactivated

---

[2] Asian Law Caucus, *Fired By an App* at 4, Feb. 2023, at https://perma.cc/X7XB-G9W8; Preetika Rana, Uber, *Lyft Drivers Clash with Riders over Face Masks*, WALL ST. J. Mar. 10, 2022, https://perma.cc/A5SC-X5BL.

[3] Daniel Miller, *Uber cracking down on users who give bad ratings to get refunds*, FOX 4 KDFW, Nov. 15, 2023, https://perma.cc/LR92-8LVA; Dara Kerr, *Uber drivers are losing their jobs over fake DUI complaints*, CNET, Mar. 16, 2020, https://perma.cc/MFG7-FPR4.

[4] Asian Law Caucus, *Fired By an App* at 4, Feb. 2023, at https://perma.cc/X7XB-G9W8.

each year (UA1291; LA1680). The New York Taxi Workers Alliance (NYTWA)—which represents 28,000 drivers—reported that more than 2,000 drivers asked for help related to deactivation every year (UA1240-41; LA1629-30).

But even drivers who had never been deactivated found it stressful to know that they could face this fate at any time. As one driver put it, "we are all one ride away from deactivation" (UA1518; LA1907). The NYTWA representative agreed that, in his experience, "every single driver works with fear and anxiety over the threa[t] of an unfair deactivation" (UA1243; LA1632).

While the companies claimed to already have a reasonable process in place for drivers to challenge deactivations (UA1337, 1345-48, 1359-73, 1491-92, 1506-07; LA1880-81, 1895-96; LA1726, 1734-37, 1748-62), many drivers and their advocates disagreed (UA1242, 1424-25, 1444-49, 1488-89, 1510, 1518, 1527; LA1631, 1813-14, 1833-38, 1877-78, 1899, 1907, 1916). NYTWA reported that drivers were "routinely" deactivated "without a fair reason, without notice, and without the right to an independent appeal process that is not controlled by the companies themselves" (UA1241, 1444; LA1630, 1833). In fact, once drivers no longer had access to the app, "they struggle[d] to have any meaningful contact with the companies" at all (UA1444; LA1833).

And because drivers often were not given a reason for their deactivation, it was virtually impossible to challenge the decision (UA1444; LA1833; *see also* UA1245; LA1634).

Legal Services NYC had the same experience with clients. Many of its driver clients had been deactivated with no notice and no meaningful way to challenge the deactivation (UA1488-89; LA1877-78). The organization reported that "[d]rivers often do not know exactly why they are deactivated" (UA1488-89; LA1877-78).

Moreover, deactivations based on certain allegations were not appealable at all (UA1658; LA2047). For example, Uber decided what was appealable on a case-by-case basis and categorically did not permit drivers to appeal any deactivation based on allegations of criminal activity (UA1446, 1488, 1658; LA1835, 1877, 2047).

For cases that were appealable, Uber and Lyft had partnered with an organization called the Independent Drivers Guild (IDG), which the companies funded, to help drivers navigate the appeals process (UA1492, 1507; LA1881, 1896).[5] While IDG's director had testified in a separate proceeding before TLC that the current deactivation system was "not fair" (UA1446 n.9; LA1835 n.9), the organization assured the

[5] Noam Scheiber, *Uber Has a Union of Sorts, but Faces Doubts on Its Autonomy*, N.Y. TIMES, May 12, 2017, https://perma.cc/X2UM-P9VM.

Council that the system worked (UA1483; LA1872). IDG claimed that it had successfully helped 20,000 drivers challenge their deactivation over the past five years, and that it had often gotten the driver reinstated within a few days (UA1659; LA2048). The Council's committee report found that this indicated many deactivations are unsupported by evidence and that many currently unappealable deactivations might also be reversed if drivers could challenge them (UA1659; LA2048). That finding was supported by a study on deactivated drivers that showed most were long-time drivers with high ratings and no record of misconduct (UA1660; LA2049).

The Council also heard evidence about the devastating consequences of wrongful deactivation (UA1656-57, 1660; LA2045-46, 2049). Eighty percent of drivers reported that driving was their sole source of income (UA1656-57; LA2045-46). And almost all drivers had incurred debt for their vehicles—generally between $40,000 and $100,000—that remained after deactivation (UA1244, 1269, 1657; LA1633, 1658, 2046). Eighteen percent of deactivated drivers lost their cars, and 12% lost their homes (UA1660; LA2049). Many more could not afford groceries (UA1244, 1660; LA1366, 2049).

### B. The City Council's enactment of the Deactivation Law to protect drivers from wrongful deactivation

In June 2023, the City Council proposed a bill prohibiting "high-volume for-hire vehicle services"—which currently includes only Uber and Lyft—from deactivating drivers except for good reason (UA1127-40; LA1516-29). The bill was modeled on the local law that protects fast-food workers, which this Court upheld against preemption and Commerce Clause challenges (UA1661; LA2050). *See Rest. Law Ctr. v. City of N.Y.*, 90 F.4th 101, 106 (2d Cir. 2024). The Council amended the proposed legislation in response to input from Uber, Lyft, and the public (UA1662-63; LA2051-52).

The final version of the law prohibits any "high-volume for-hire vehicle service"—like Uber and Lyft—from deactivating drivers permanently, for more than three consecutive days, or for seven days within a one-year period, except where required by law, for just cause, or for a bona fide economic reason. N.Y.C. Admin. Code § 20-1282(a). Just cause includes misconduct and a driver's failure to satisfactorily perform their duties. *Id.* § 20-1281. In some cases, the law requires the companies to provide two weeks' advance notice to drivers before any deactivation. *Id.* § 20-1282(d). And the companies must follow a progressive discipline policy. *Id.* § 20-1289.

However, no notice is required for deactivations based on "egregious misconduct," account sharing, or a pattern of repeated fraudulent behavior. *Id.* § 20-1282(d). To address the companies' concerns about the safety of their passengers and the public, the Council defined egregious misconduct broadly to mean any form of unlawful discrimination and any conduct that poses an imminent danger to others, including violence, threats, sexual harassment, and sexual assault (UA1662-63; LA2051-52). *Id.* § 20-1281. The companies retain the ability to immediately deactivate any driver accused of such conduct, without notice or utilizing progressive discipline. Although advance notice is not required, the companies must provide a written explanation within five days following deactivation. *Id.* § 20-1282(e).

The companies must also provide an informal procedure for drivers to challenge their deactivation. N.Y.C. Admin. Code § 20-1287. Drivers dissatisfied with the informal resolution may challenge their deactivations by filing a complaint with DCWP, which has the power to order reinstatement and damages, or they may file suit in court. *Id.* §§ 20-1207; 20-1208; 20-1211. In the event of such a challenge, the companies bear the burden of proving, by a preponderance of the evidence, that they had just cause to deactivate the driver. *id.* § 20-1285.

Because evidence before the Council showed that the problem of unfair deactivations dated to at least 2020 (UA1661 n.39; LA2050 n.39), the law contains a look-back provision that allows drivers deactivated within the last seven years to petition for reinstatement. N.Y.C. Admin. Code § 20-1283(a). On request, the companies are required to reinstate those drivers unless the deactivation was for just cause or another allowed reason. *Id.* § 20-1283(a). But the companies are not required to reactivate any driver if they are not currently hiring. *Id.* § 20-1283(d).

The bill became law on January 29, 2026, with an effective date of July 28, 2026. DCWP subsequently proposed rules to enforce the law (UA2100-25; LA2489-2514). Of relevance here, the rules define broadly the phrase "imminent danger," which allows immediate deactivation without advance notice (UA2103; LA2492). They also provide that the companies can cure a defective notice, and that a fact-finder should consider whether records are available in deciding whether the companies must rehire a driver under the lookback provision (UA2098; LA2487).

### C. This proceeding

#### 1. The complaints alleging that the law impaired the companies' contracts with drivers

Uber and Lyft separately sued to challenge the Deactivation Law on its face, each alleging (among other things) that the law violated the Contract Clause (UA81-89; LA32-34). Both companies have standard contracts that drivers must accept to gain access to the app. Uber's current contract dates from January 1, 2022, and incorporates guidelines posted on its website (UA31; UA137-64). Lyft's current contract dates from February 9, 2026—after the law's enactment—and incorporates undated guidelines from its website (LA15-16, 75-99).

Uber alleged that its contracts permit it to deactivate drivers without notice at its discretion to investigate allegations of misconduct and to permanently deactivate drivers without notice if it finds that the driver has engaged in a broad array of conduct, including activity that is unsafe, fraudulent, illegal, or harmful to Uber's brand like rudeness or poor judgment (UA19, 31-36). Uber also alleged that its contracts permit it to withhold from drivers any specific information about passenger complaints (UA20).

According to Uber, more than half of deactivations last year were due to "safety" issues like sexual misconduct, dangerous driving, or drug

use (UA39). Fraud is claimed to be the second most common reason for deactivations (*id.*). Safety and fraud together, Uber states, accounted for 92% of deactivations in the City in 2025 (*id.*). The remaining 8% were mostly due to information discovered in a background check or poor ratings from passengers, according to the company (UA40).

Uber alleged that, even though not required by its contracts, it does in some instances give drivers general information about customer complaints or the reason for deactivation (UA42-45). And the company claimed that some drivers are "eligible" to appeal the decision and can get assistance from the Independent Drivers Guild (UA45-48).

Lyft alleged that its contracts require it to give notice (though neither the contract nor the complaint says how much) and an opportunity to cure before deactivating drivers who fall below a particular rating, or when the company believes deactivation is necessary "to protect the safety of the Lyft community" (LA16). The contracts permit Lyft to immediately deactivate drivers without notice for stalking, harassment, discrimination, fraud, lack of a driver's license or insurance, and conduct that interferes with the app (*id.*). Lyft provided no data about how many drivers it deactivates or the most common reasons for deactivation. Lyft alleged that drivers may appeal

permanent deactivations through an informal process or through binding arbitration (LA17).

Both companies moved for preliminary injunctions under their Contract Clause claims. According to Uber, the law prevented it from deactivating drivers without notice, even if the driver engaged in unsafe, illegal, or fraudulent activity (Uber MOL at 11). Lyft similarly claimed that the law would prevent it from immediately deactivating a driver who threatened a rider or public safety (Lyft MOL at 10). The companies claimed their corporate brands would be irreparably harmed by having to retain or reactivate drivers who had engaged in unsafe behavior (Uber MOL at 23-24; Lyft at 19).

### 2. The district court's decision preliminarily enjoining enforcement of the law in its entirety

The district court, having consolidated the cases for decision, granted the preliminary injunctions, holding that the companies were likely to succeed on their Contract Clause claims (Special Appendix (SPA) 21). To prevail, the companies have to prove that the law substantially impairs their preexisting contracts with drivers; does not serve a legitimate public purpose; and is not reasonable or necessary to address the Council's concerns. *See Real Estate Bd. of N.Y., Inc. v. City*

*of N.Y.* ("*REBNY*"), 182 F.4th 140, 163 (2d Cir. 2026). The court found that the companies were likely to succeed in making that showing (SPA21-22).

The court first determined that the law would substantially impair the companies' contracts with their drivers (SPA24-31). The court reasoned that the companies' unilateral power to deactivate drivers is a central provision of the contracts, and the law undermines that power by subjecting deactivation decisions to review by others, potentially a court or DCWP (SPA24-27). The court also concluded that the law interferes with the companies' reasonable expectations and prevents them from safeguarding their right to deactivate drivers on their own terms (SPA24-31).

Further, the court concluded that the law does not serve a legitimate public purpose (SPA32-38). The court acknowledged the City had "identified a genuine public interest" and that the legislative record showed "real hardships associated with deactivation," but it believed that the problem was insufficiently widespread to justify action (SPA32, 34, 48). The court criticized the Council for failing to establish how many wrongful deactivations occurred yearly (SPA35), even though the information required to make that determination is in the companies'

exclusive possession, and one survey indicated two thirds of drivers had experienced at least a temporary deactivation.

The court also took a narrow view of the law's benefits. It reasoned that the law benefitted only the allegedly small number of drivers who are permanently and wrongfully deactivated each year and did not address "society's larger interest," including the possibility that the law would make ridesharing more expensive (SPA33-36, 38). And the court objected to purportedly hostile statements by one Council Member about Uber and Lyft (SPA34, 36). It also believed that the law might make passengers and pedestrians unsafe, even though the law permits the companies to immediately deactivate any driver who engages in conduct that puts others in imminent danger (SPA37).

The court determined that it did not need to consider whether the law was a reasonable or necessary means of addressing wrongful deactivations (SPA38-44), but it nonetheless decided that the companies had "raised substantial questions" on this point (SPA38). The court acknowledged that the City was entitled to substantial deference as to the need for and reasonableness of the law, and it agreed that the record supported the Council's determination that drivers are economically vulnerable and should have notice before deactivation, an opportunity to respond to any allegations, and a right to appeal the

decision (SPA38, 40, 43). But according to the court, several other parts of the law were insufficiently connected to the problem of wrongful deactivations.

The court determined that the companies did not need to show irreparable harm because of their likelihood of success on a constitutional claim (SPA45). But the court also found that the law threatened to irreparably harm the companies' reputation for safety (SPA46). Even though the law permits them to immediately deactivate drivers who engage in various forms of dangerous or otherwise serious misconduct, the court speculated that the companies might have to retain a driver who engaged in dangerous or threatening behavior (SPA45-46).

Finally, the court concluded that the balance of equities and the public interest favored an injunction (SPA48). The court acknowledged the "genuine public interest" in providing drivers with fair deactivation procedures, but it decided this interest is outweighed by the changes the companies would have to make to their contracts and the safety issues the law supposedly created (SPA48-49).

The court enjoined enforcement of the law in full a week before its July 28, 2026 effective date. Although the City urged the court to sever any parts of the law it found problematic or at least permit the law to be

enforced prospectively (UA2286-87), the court refused to do so. And the court applied the injunction to post-enactment and even future contracts, even though the Contract Clause doesn't apply to them.

The City appealed, and this Court granted its motion to expedite the appeals and ordered them to be heard in tandem.

## STANDARD OF REVIEW AND SUMMARY OF ARGUMENT

This Court reviews the grant of a preliminary injunction for abuse of discretion, and the legal conclusions underlying the decision *de novo*. *See REBNY*, 182 F.4th at 150. A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *Id.* Whether a law violates the Contract Clause is a legal question reviewed *de novo*. *See CFCU Cmty. Credit Union*, 552 F.3d 253, 259 n.3 (2d Cir. 2009). Applying that standard, this Court should reverse.

**I.** The companies failed to demonstrate that irreparable harm was likely, rather than remote or speculative. The court mistakenly applied a presumption of irreparable harm based on the companies' purported likelihood of success, but neither this Court nor the Supreme Court has applied that presumption to the Contract Clause. And the court's alternative finding of irreparable harm was based on speculation about

instances where the public could be put at risk because the companies would be required to reactivate a dangerous driver. The companies offered no sound basis to think this would occur, especially given the Deactivation Law's express provisions concerning egregious misconduct. Irreparable harm is a requirement for a preliminary injunction, and this Court may reverse on this basis alone.

The district court also erred in finding that the companies are likely to prevail on their Contract Clause claims. To do so, the companies will have to prove that the Deactivation Law substantially impairs their contracts without a legitimate public purpose or in an unreasonable manner. *REBNY*, 182 F.4th at 163. The companies are not likely to succeed on these claims.

Lyft's claim fails out of the gate because the company entered into new contracts with all its drivers on February 9, 2026, after the Deactivation Law's enactment. The Contract Clause protects only contracts that predate the enactment of the challenged legislation. *See REBNY*, 182 F.4th at 162. Lyft has no claim, and the Deactivation Law must be allowed to go into effect as to its drivers.

As to both companies, the district court also failed to recognize that they challenge the Deactivation Law on its face, not in any particular application. Facial challenges are the "most difficult" for a

plaintiff to win. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Hudson Shore Assocs. Ltd. P'ship v. N.Y.*, 139 F.4th 99, 107 (2d Cir. 2025). To succeed on the merits, the companies will have to show that the Deactivation Law is unconstitutional in every application, *Cmty. Hous. Improvmt. Program. v. City of N.Y.*, 59 F.4th 540, 548-49 (2d Cir. 2023), but the court never even mentioned this standard, and certainly didn't apply it.

The court's failure to apply the proper standard for a facial challenge led it to wrongly determine that the companies were likely to prove that the Deactivation Law on its face substantially impairs their driver contracts. First, there is no substantial impairment because the deactivation provisions are just one part of contracts covering every aspect of the relationship between the companies and drivers; they are not the contracts' central component, especially given the companies' own claims that they invoke them only infrequently and already provide notice and process. And even if the deactivation clauses were central to the bargain, the companies remain free to deactivate drivers in most cases where they claim to be doing so.

Indeed, there are plainly cases where the companies will be able to immediately deactivate drivers without notice—such as if a driver's behavior indicates fraud, is discriminatory, or poses imminent danger

to others—and the law will not substantially impair the companies' contracts with drivers in such cases. And they can deactivate drivers who commit more minor forms of misconduct after giving warnings and notice. The law may delay deactivation in some cases—and forestall it where unjustified—but that is hardly a substantial impairment.

And if a deactivated driver challenges the decision, the companies will be able to keep them off the app by retaining the evidence supporting their decision—something they surely do anyway—and presenting it to a fact-finder. If the companies have reason to believe the driver committed the misconduct, they should be able to convince the fact-finder.

These many discernible instances in which the Deactivation Law would not substantially impair the companies' contracts doom their facial challenges, which required them to show that the law will substantially impair their contracts in all applications. In ruling otherwise, the court improperly focused on hypothetical situations where the law might impair the companies' contractual rights and presumed without basis that adjudicators will apply the law in an expansive manner to preclude many deactivations.

Moreover, reasonably foreseeable legislation does not substantially impair a contract, and the Deactivation Law was eminently

foreseeable. The for-hire vehicle industry is heavily regulated, so the companies were on notice of the possibility of additional regulation. There have been calls to regulate deactivations since at least 2019—predating both companies' current contracts—and the Council has repeatedly passed similar worker protections in other low-paying industries over the past few years, including regulations affecting Uber and Lyft. Any expectation the companies had that the City would not grant protections to drivers was unreasonable.

Even if the Deactivation Law did substantially impair the companies' contracts, such an impairment is permissible. The Contract Clause permits the impairment of a contract so long as the law is an appropriate and reasonable way to advance a significant and legitimate public purpose. The City has an obvious interest in ensuring fair working conditions for drivers, a vulnerable population subject to take-it-or-leave-it contracts who invest substantial amounts to become drivers, including maintaining their own vehicles.

The record before the City Council established that drivers who are deactivated without a good reason face major hardships and few other options to earn a living in their chosen field, and the law is a reasonable way to address that problem. It affords drivers fair standards for deactivation and an effective means to seek redress if they believe

they have been deactivated unfairly. The law does not prevent the companies from deactivating drivers who engage in improper conduct.

Rather, it permits the companies to continue to immediately deactivate, without advance notice, drivers who commit serious misconduct, and it may delay deactivation for minor problems, requiring the companies to give notice and an opportunity to respond and improve their performance first. And the law puts the burden of proving misconduct on the party with the most information and resources: the companies. The district court erred in finding that the law's requirements are not a reasonable way for the City to address the problem of unfair deactivations, applying a form of scrutiny approaching strict scrutiny even though the Contract Clause is not so demanding; refusing to defer to the City's assessment of the law's reasonableness as required by this Court's precedent; and requiring unjustified precision in the legislature's choice of means.

Finally, the court erred in finding that the balance of the equities and public interest favored an injunction. The City's interest in protecting drivers far outweighs the companies' speculation about hypothetical harms they might one day suffer.

**II.** At a minimum, the injunction is overly broad. Injunctions must be narrowly tailored to permit lawful activity, but the court,

employing a misguided severability analysis, enjoined the law as to many constitutional applications. Most importantly, the court decided to extend the injunction to contracts between the companies and drivers established after the law's enactment even though the Contract Clause has no application to such contracts. If the Court does not reverse, it should narrow the injunction's scope.

# ARGUMENT

## POINT I

## THE DISTRICT COURT ABUSED ITS DISCRETION IN GRANTING A PRELIMINARY INJUNCTION

A preliminary injunction is an extraordinary remedy. *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666-67 (2d Cir. 2023). To justify it, the companies had to prove irreparable harm, a likelihood of success on the merits, and that the equities and public interest support an injunction. *REBNY*, 182 F.4th at 150. The district court committed multiple legal errors in finding that they met this standard.

### A. The companies failed to show irreparable harm.

A preliminary injunction was improper because the companies failed to demonstrate irreparable harm. *See Almontaser v. NYC Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (party seeking preliminary

injunction "must" show irreparable harm). Such harm must be "*likely*" rather than remote or speculative. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008); *see also Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 248 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (June 30, 2026). The companies did not make such a showing, and the Court may reverse on this basis alone.

As an initial matter, the district court erred by holding that the companies were not required to prove irreparable harm because they had supposedly demonstrated a likely constitutional violation (SPA45). The Supreme Court has applied this presumption of irreparable harm only in First Amendment cases, and this Court has extended it to the Fourth and Eighth Amendment. *Nat'l Ass'n for Gun Rights*, 153 F.4th at 248. But just last year the Court cautioned "against extending the presumption to new contexts." *Id.* Neither the companies nor the district court provided any reason for ignoring this warning. Nor did they offer any reasoned explanation why this Contract Clause challenge would warrant a presumption of irreparable harm.

The court alternatively found that the companies had shown the threat of irreparable harm even without the presumption (SPA45-47). But the finding is based on the mere possibility of harm rather than an actual and imminent threat. *See Winter*, 555 U.S. at 22. Uber and Lyft

drivers are not inherently dangerous, and the district court's contrary presumption is offensive and unsupported by the record.

The court found that the loss of rider trust "could" reduce demand for the companies' services; that drivers "may" make less money "if" passengers avoid using the apps due to safety concerns; that the law "may" prevent the companies from deactivating a dangerous driver; that the law "may" lead to passenger injuries and "could" expose the companies to lawsuits "if" the company were prevented from deactivating a driver who later assaults a passenger (SPA45-47). No record evidence shows that any of these hypotheticals is likely to occur. *See Winter*, 555 U.S. at 22. And because the law expressly permits the companies to immediately deactivate drivers who engage in dangerous conduct, these hypotheticals are in fact unlikely. The preliminary injunction should be vacated due to the lack of irreparable harm. *See JTH Tax*, 62 F.4th at 663 ("[I]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.").

### B. The court erred in finding that Uber and Lyft were likely to succeed on the merits of their facial Contract Clause claims.

This Court may also reverse for the independent reason that the companies are unlikely to succeed on the merits of their Contract Clause

claims. The Contract Clause forbids laws that substantially impair the "obligation of contracts" without good reason. *REBNY*, 182 F.4th at 161. The companies invoke this constitutional provision because they require drivers to execute standardized, non-negotiable independent-contractor agreements that afford the companies enormous discretion to decide when drivers have engaged in conduct that should preclude them from being able to work. But the idea that the freedom of contract bars worker-protection legislation, especially for workers "who are in an unequal position with respect to bargaining power," was rejected long ago. *See West Coast Hotel v. Parrish*, 300 U.S. 379, 392-93, 399 (1937). Today, it is clear that the Contract Clause "does not trump the police power of the state to protect the general welfare of its citizens." *Buffalo Teachers Fed. v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006).

To prevail on their Contract Clause claims, the companies had to prove that the Deactivation Law substantially impairs their preexisting contracts with drivers and, if so, that the law does not serve a legitimate public purpose and is not reasonable or necessary to address the City's concerns about the unfair working conditions drivers face. *See REBNY*, 182 F.4th at 163. And because this is a facial challenge, the companies had to show that they are likely to prove the law's unconstitutionality in every possible application. *Cmty. Hous. Improvmt. Program. v. City of*

*N.Y.*, 59 F.4th 540, 548-49 (2d Cir. 2023). They did not make that showing.

As an initial matter, the Deactivation Law does not impair any contracts between the companies and drivers formed after the law's enactment in January 2026. The Contract Clause protects only preexisting contracts and has no application to contracts formed after a law's adoption. *See Veix v. Sixth Ward Bldg. & Loan*, 310 U.S. 32, 38 (1940) ("Unquestionably for the future, the provisions of the [statute] would be effective."); *Harmon v. Markus*, 412 F. App'x 420, 423 (2d Cir. 2011). That's because "[l]aws and statutes in existence at the time a contract is executed are considered a part of the contract, as though they were expressly incorporated therein." *2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1254 (2d Cir. 1991); *see also City of El Paso v. Simmons*, 379 U.S. 497, 508 (1965).

Any other rule would allow every employer to contract around worker-protection legislation, an idea the Supreme Court has firmly rejected. *See Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) (party whose rights are restricted by statute cannot avoid restrictions by contracting around them). The background law incorporated into a contract includes legislation that has been enacted but not yet gone into effect. *See id.* at 189 (stating Contract Clause applied to contracts

entered into before the statute was enacted); *Texaco Inc. v. Short*, 454 U.S. 516, 531 (1982) ("The statute cannot be said to impair a contract that did not exist at the time of its enactment."); *Stockholders of Peoples Banking Co. v. Sterling*, 300 U.S. 175, 184 (1937) (as to contracts entered into after the statute became law, "the statute is impregnable"); *REBNY*, 182 F.4th at 162 (Contract Clause claim applied only to agreements predating the challenged law's enactment that remained in effect on its effective date).

Although, as discussed in Point II, this observation has significance for the injunction's scope, it also bears on whether the companies—Lyft in particular—have a claim in the first place. Lyft entered into new contracts with all its drivers on February 9, 2026 (Lyft terms and conditions). Thus, *none* of the company's current contracts with drivers predate the Deactivation Law's January 29, 2026 enactment date—and the same was true when the district court issued the preliminary injunction. The court therefore should have, at minimum, concluded that none of Lyft's contracts were substantially impaired. Uber also cannot challenge the law's application to any contracts it entered into with drivers since the law's enactment. The district court did not recognize these limitations of the companies' claims.

In addition to this fundamental error, the court's analysis was deeply flawed in multiple other ways.

#### 1. There are many instances where the law would not substantially impair the companies' right to deactivate drivers.

The Contract Clause limits only substantial impairments of contracts. *REBNY*, 182 F.4th at 163. In considering whether an impairment is substantial, this Court generally looks at the extent to which the law undermines the contractual bargain, interferes with the parties' reasonable expectations, and prevents the parties from safeguarding their rights. *Id*. The companies cannot prevail under this standard.

To start, the district court erred in finding that the companies' right to deactivate drivers is central to the contracts (SPA25). The contracts define the many terms of the companies' relationships with drivers, and most of their provisions have nothing to do with deactivation. The law affects one part of the companies' relationship with their drivers and does not rise to the level of a substantial impairment of the contracts as a whole. *Cf. REBNY*, 182 F.4th at 164 (challenged law "undermine[d] the contractual bargain" because it prohibited two of the "three essential elements" of the contracts). That

is especially so given the companies' claims that they rarely deactivate drivers and already follow fair procedures. If that's true, then the contracts will rarely, if ever, be impaired.

Even accepting the district court's conclusion that the deactivation provision is central to the contracts, the law's impairment of that part of the contracts is not substantial as a facial matter. The law's impact will vary greatly depending on the circumstances, as different provisions will apply based on what kind of misconduct the driver is accused of. Yet the companies have made no attempt to separate out the impact of individual provisions, opting instead for a broadside against the entire legislation. And they did not show that the law will substantially impair their contracts in all circumstances.

#### a. The companies remain free to deactivate drivers in a broad range of circumstances.

The Deactivation Law does not substantially impair the companies' right to deactivate drivers who engage either in serious or more minor misconduct.

As to the first, the contracts generally permit the companies to immediately deactivate any driver who (among other things) loses their drivers' license; commits fraud; or stalks, harasses, or discriminates

against a passenger (UA145, LA1343; LA79-80, 84). The law does not substantially interfere with the companies' right to do so. Rather, the companies remain free to immediately deactivate, without prior notice, drivers who engage in account sharing, fraudulent behavior, or egregious misconduct—which is defined broadly to include discrimination, threats, violence, or any conduct that poses an imminent danger. N.Y.C. Admin. Code §§ 20-1281, 20-1282. According to the companies' own claims, the vast majority of deactivations are for safety violations or fraud—Uber says 92%; Lyft did not quantify. Thus, the companies showed no likelihood that their ability to immediately deactivate drivers (or to refuse to reactivate them) is substantially impaired in all circumstances (UA634-35).

The district court seemed to believe that the law's "egregious misconduct" standard—which allows deactivation for (among other things) conduct that poses an "imminent danger" to others—would not permit the companies to deactivate all drivers who engage in dangerous behavior (SPA46). That speculation is insufficient to enjoin a law on a pre-enforcement facial challenge, where courts must exercise restraint to avoid anticipating constitutional problems. Fact-finders and state courts may well interpret "egregious misconduct" and "imminent danger" in the companies' favor, and the district court should not have

assumed that the law will be implemented so as to substantially impair the companies' contracts in all instances. *Hudson Shore*, 139 F.4th at 107; *see Moody v. NetChoice*, LLC, 603 U.S. 707, 723 (2024) (cautioning courts not to speculate about a "law's coverage and its future enforcement" in facial challenges). That is especially true where the companies have not been forthcoming about the details of their deactivation decisions. For all we know, every safety-related deactivation the companies have made would qualify as egregious misconduct. Indeed, DCWP has proposed a rule that broadly defines "imminent danger" as it pertains to the standard of "egregious misconduct" (UA2103; LA2492). The district court should not have assumed that the law will prevent the companies from immediately deactivating drivers who endanger others, given that the companies have the burden of proof to justify a preliminary injunction.

The law's requirements that the companies tell drivers who allegedly commit egregious misconduct why they were deactivated after the fact and establish just cause before a neutral fact-finder if a driver challenges the decision, also do not constitute a substantial impairment. N.Y.C. Admin. Code §§ 20-1282(d), 20-1285. These requirements at most add some steps following deactivation, rather than acting as a bar, at least in many instances. They thus effectively impose something akin

to a "paperwork requirement," which does not violate the Contract Clause. *Sveen v. Melin*, 584 U.S. 811, 24 (2018); *see Conely v. Barton*, 260 U.S. 677, 679 (1923) (upholding law requiring banks to file affidavit before foreclosing on properties). These additional steps do not undermine the companies' broad authority over deactivations since the companies retain the right to immediately deactivate the drivers in many instances and keep them off where they show justification. And the companies may still invoke the contracts' arbitration clauses as to private suits (SPA17).

While the law's impact differs as to drivers who engage in minor misconduct, it does not substantially impair the companies' rights in that area either. Nothing in the law prohibits the companies from setting their own rules of conduct and enforcing them through discipline. The law requires advance notice before deactivation for minor misconduct, but laws requiring notification are generally not found to substantially impair a contract. *Sveen*, 584 U.S. at 823-24 ("[T]he Court has long upheld against Contract Clause attack laws mandating other kinds of notifications or filings."); *Curtis v. Whitney*, 13 Wall. 68, 70 (1872) (upholding law requiring buyer of property at tax sale to notify delinquent landowner, who could pay taxes to prevent final sale).

The minimal nature of the impairment in these types of cases is further supported by the companies' own factual assertions, under which the advance notice requirement will apply only in a small number of instances. Uber claims (UA634-35) that the vast majority of its deactivations are for safety and fraud violations, for which the law does not require advance notice—or at least may not require it, which is enough for this facial challenge. *See Donohue v. Cuomo*, 980 F.3d 53, 82 (2d Cir. 2020) (minimal impairments to contracts are permissible). And because both companies claim to already give advance notice in many cases—Lyft's contract requires it in certain circumstances—the law imposes no great burden in any instance where the companies would already give notice and thus works no substantial impairment in those instances (UA604; LA84). *See Sveen*, 584 U.S. at 823-24. The companies did not even provide details about how much advance notice they provide. For all we know on this record, they already provide two weeks' notice in many instances. Again, they bore the burden of proof.

The progressive discipline provision—which was imported from the City's earlier law extending just cause protections to fast-food workers—similarly does not substantially impair the contract. First of all, this provision is inapplicable to drivers who commit egregious misconduct, which, again, by Uber's report, seem to make up the vast

majority of cases. Second, this provision at most delays, but does not eliminate, the companies' ability to deactivate a driver who violates their policies. That, as discussed, is not a substantial impairment.

The district court instead reasoned that the law substantially impaired the companies' contracts because it "converts a voluntary practice into a mandatory obligation" (SPA27). But the companies' preference to engage in conduct voluntarily rather than by legal requirement is not the stuff of a Contract Clause challenge. At minimum, there can be no substantial impairment of their contractual rights in any instance where their contractual and legal obligations align. For a facial challenge, the companies must show that their contractual rights are substantially impaired in all applications of the Deactivation Law, but they are unlikely to be able to meet that burden.

#### b. The companies could not have reasonably expected the City to refrain from regulating in this area.

The companies also failed to show that the Deactivation Law interfered with their reasonable expectations when they began using these contracts in 2022 and 2026, which is arguably the most important factor in deciding whether an impairment is substantial. *See Principle Homecare, LLC v. McDonald*, 158 F.4th 326, 332 (2d Cir. 2025). When

the companies' "contractual obligations were originally undertaken," *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978), the Deactivation Law was not "wholly unexpected" but rather completely foreseeable, *see Donohue*, 980 F.3d at 82; *see also Alliance of Auto Mfrs., Inc. v. Currey*, 610 F. App'x 10, 14 (2d Cir. 2015) (no substantial impairment where legislation was "eminently foreseeable").

To be sure, prior regulation alone does not shield a law from Contract Clause scrutiny. *REBNY*, 182 F.4th at 164. But the Supreme Court has long held that companies operating in industries subject to "extensive and intrusive" regulation should expect more regulation—even if prior laws did not "specifically" address the issues set out in the contract. *Energy Reserves*, 459 U.S. at 413. The for-hire-vehicle industry has been heavily regulated for decades, and worker protection laws date back even further. *See CompassCare v. Hochul*, 125 F.4th 49, 60 (2d Cir. 2025) (working conditions have long been regulated); *Progressive Credit Union v. City of N.Y.*, 889 F.3d 40, 45-47 (2d Cir. 2018) (discussing regulation of taxis and other for-hire vehicles).

The City's regulation of for-hire vehicle service is extensive, covering vehicle inspections and alterations, tolls, interior advertising, and how often a vehicle must be replaced, among many other things. *See, e.g.*, 35 R.C.N.Y. §§ 59a-13, 59a-26, 59a-28, 59-e. And nearly two

dozen additional regulations apply specifically to high-volume for-hire vehicle services like Uber and Lyft. These regulations govern licensing, drivers' personal conduct, handling of customer complaints, recordkeeping, minimum driver pay, and platform access. *See* 35 R.C.N.Y. §§ 59d-01 through 59d-22; N.Y.C. Admin. Code § 19-549; Local Law 147 of 2018. The companies' right to operate in the City and their treatment of workers have long been subject to regulation, and they "cannot remove them[selves] from the power of the state" by contract. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 438 (1934).

The district court decided that the City's prior regulation did not infringe the companies' deactivation authority and thus did not put the companies on notice that the City might regulate in this area (SPA29). But that's not true. If TLC revokes a driver's license or finds their car unsafe, the company must deactivate them. And the minimum-pay laws and limits on the number of licenses that can be issued also limited the companies' contracting authority with drivers. These requirements clearly "pertained to" the companies' relationship with its drivers, including its right to hire and obligation to deactivate drivers, *Melendez*, 16 F.4th at 1034-35, as the contracts themselves recognized (*see* UA139 (driver responsible for obtaining license, permit, or registration

applicable to for-hire service); LA80 (drivers warrant that they have all licenses, approvals, and authority required to provide transportation in their jurisdiction)). That's why the companies have repeatedly sued the City over its regulations. *See, e.g., Matter of Tri-City v. N.Y.C. Taxi & Limousine Comm'n*, 189 A.D.3d 652 (1st Dep't 2020) (challenge to TLC's minimum pay rules by subsidiaries of Lyft); *Zehn-NY LLC et al. v. City of N.Y.*, 2019 N.Y. Misc. LEXIS 5875, at *1-8 (Sup. Ct. Oct. 28, 2019) (cap on for-hire-vehicle licenses); *Zehn-NY LLC et al. v. City of N.Y.*, 2019 N.Y. Misc. LEXIS 6789, at *1 (Sup. Ct. Dec. 23, 2019) (TLC's cruising regulation).

What's more, prior regulation need not have been specifically on the same point to set the companies on notice of the possibility of future regulation. *See Energy Reserves Group*, 459 U.S. at 411 (considering whether "the industry" has been regulated in the past); *Allied Structural Steel Co.*, 438 U.S. at 250 (finding Contract Clause violation where law was not in "an area" already subject to regulation). The companies knew, or should have known, that the laws governing their industry might change. *See also Olson v. Cal.*, 104 F.4th 66, 71 (9th Cir. 2024) (upholding 2019 California law intended to make it harder for transportation apps like the companies to classify drivers as independent contractors).

The district court relied on a statement in *REBNY* that a law is not foreseeable "simply because Plaintiffs knew the City may have, at some point in the future, implemented a law like this one" (SPA28 (quoting 182 F.4th at 164)). That sentence did not establish any categorical rule. Nor did it overturn the decades of law from this Court and the Supreme Court holding that participants in a heavily regulated industry cannot reasonably expect the law to remain unchanged. *See, e.g., Energy Reserves*, 459 U.S. at 413. Moreover, compelling facts distinguish this case from *REBNY*, where the City's brief did not even argue reasonable expectations and the Court thus did not confront any argument about the degree of prior regulation. Here, by contrast, the City has heavily regulated the for-hire-vehicle industry for decades, including laws specifically affecting the companies' business model.

The district court also relied on a Council Member's statements to the press describing the law as unprecedented (SPA28). But a politician's personal opinion is irrelevant to the legal question whether an industry is heavily regulated. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history.").

Nor is prior regulation the only way to show a party's reasonable expectations. *See Sullivan*, 959 F.3d at 64 (reasonable expectations

depend "in part" on regulation in the industry). Calls for stronger worker protections for Uber and Lyft drivers have resounded across the country—and even the world—for many years, since well before the companies began using their current contracts in 2022 and 2026. As early as 2015, the *New Yorker* discussed whether drivers, who are generally independent contractors, should get the worker protections typically afforded to employees.[6] The following year, the *New York Times* reported on drivers' demands for worker protections.[7] In 2019, the *Washington Post* published an article titled "What California Should Do Next to Help Uber Drivers."[8] In 2020, Uber drivers protested outside its CEO's home to demand better treatment.[9] Two months later, that CEO published an op-ed in the *New York Times* titled "I Am the CEO of Uber. Gig Workers Deserve Better" and asserting "we support laws" to improve working conditions.[10]

---

[6] James Surowiecki, *Gigs with Benefits*, The New Yorker, June 29, 2015, https://perma.cc/89U6-N5CY; *see also* Michael Hiltzik, *U.K. Court Reaches Obvious Conclusion That Uber Drivers are Workers*, L.A. Times, Feb. 19, 2021, https://perma.cc/JU7V-5SVX.

[7] Katie Benner, *Uber Rolls Out App Improvements to Meet Driver Demands*, N.Y. Times, June 6, 2016, https://perma.cc/W3ZK-FQ3S.

[8] Sharon Block, *What California Should Do Next to Help Uber Drivers*, Wash. Post, Sept. 13, 2019, https://perma.cc/W6N8-Q5D7.

[9] Angel Au-Yeung, Uber Drivers Stage Protest Outside Uber CEO's House in San Francisco, Forbes, June 24, 2020, https://perma.cc/BV65-WAZJ.

[10] Dara Khosrowshahi, *I am the CEO of Uber. Gig Workers Deserve Better*, N.Y. Times, Aug. 10, 2020, https://perma.cc/VQ4D-J37N.

Zooming in further, the companies should have expected regulation of their deactivation practices specifically since at least 2019—again, well before the dates of their current contracts—when drivers sought federal "oversight of Uber and Lyft's deactivation process."[11] That same year, NYTWA petitioned the City to pass a law to "end[] unfair deactivations without notice, cause, or appeal" (LA354).[12] And around the same time, the Council extended worker protections to other vulnerable groups, including just cause protections for fast-food workers. In 2021, Seattle enacted a "Driver's Deactivation Rights" ordinance. Seattle Mun. Code 143.2.50. Other jurisdictions followed suit. *See* RCW 49.46.300 (Washington State); Minn. Statute § 181C.04; Col. Rev. Statutes § 8-4-127. This law did not come out of nowhere, and the companies cannot plausibly claim to have been unable to reasonably expect it. Indeed, the Council first introduced the Deactivation Law back in June 2023.

And it's not just that the companies *should* have expected regulation in this area. They *did*, in fact, expect such regulation, and they

---

[11] Vanessa Romo, *Uber Drivers Are Not Employees, NLRB Rules*, NPR, May 15, 2019, https://perma.cc/RB47-45NF.

[12] NYTWA Campaign: Job Security for App Drivers, https://perma.cc/52JR-9T7F.

have long employed lobbyists and engaged in other tactics to avoid it.[13] Uber's director of public policy acknowledged that the company had "worked in other jurisdictions to figure out better deactivation policies" (UA1372; LA1725-28, 1734-41). The companies have known for years that laws like this were likely, and any expectations they had to the contrary were unreasonable. *See Donohue*, 980 F.3d at 82 (reasonableness of expectations depends in part on whether legislative action was foreseeable); *see also Olson*, 104 F.4th at 76 n.4 (rejecting Contract Clause claim because Uber and others could not have reasonably expected their treatment of drivers to remain unregulated).

When Uber drafted its current contracts, which became effective January 1, 2022, and at any time it entered into a contract with a driver thereafter, it should have expected regulation to protect drivers from deactivation. And Lyft's argument about upset expectations is even more untenable, given that it required drivers to accept new contract after the City Council enacted the Deactivation Law.

---

[13] *See, e.g.,* Tina Bellon, *Uber, Lyft Have a California Playbook to Fight Proposed U.S. Rules on Workers*, REUTERS, May 3, 2021, https://perma.cc/KM7L-ANL8; Anna Sanders, *Ride-sharing Companies Spent Over $1M Lobbying in NYC*, POST, Aug. 4, 2018, https://perma.cc/RR9K-3MF9; Elliot Njus, *Portland to Investigate Uber's Greyball Scheme to Thwart Regulators*, THE OREGONIAN, Mar. 6, 2017, https://perma.cc/7HAL-APN2.

#### c. The companies can safeguard their right to deactivate drivers by documenting their decisions.

Finally, the Deactivation Law does not prevent the companies from safeguarding their rights in all circumstances. Rather, the companies can safeguard their rights to deactivate drivers who have performance issues or engage in misconduct by documenting their reasons, giving warnings for minor problems, and presenting their evidence to a fact-finder if challenged. *See Sveen*, 584 U.S. at 823-24 (no Contract Clause violation where party could safeguard rights "by taking an action"). *Texaco, Inc. v. Short*, 454 U.S. 516, 531 (1982) (no violation where company could safeguard its rights by filing papers with the county). If the companies have a good reason to believe a driver has engaged in dangerous behavior, the Deactivation Law does not stop them from deactivating that person.

* * *

Because the companies cannot show that the law would substantially interfere with their contractual rights in every application, they do not have a likelihood of success on the merits. *See Hudson Shore*, 139 F.4th at 107. The Court need not read further to reverse. *See Sveen*, 584 U.S. at 819 (court need not consider means and ends if law does not substantially impair contract).

#### 2. The Deactivation Law survives Contract Clause scrutiny.

The Deactivation Law separately survives Contract Clause scrutiny because it serves a legitimate public purpose through reasonable means. *REBNY*, 182 F.4th at 163. The assessment of means and ends accords considerable deference to the legislature's choices. *See Melendez v. City of N.Y.*, 16 F.4th 992, 1032 (2d Cir. 2021) (stating that standard is "more demanding" than rational basis review but "more deferential" than strict scrutiny); *see also U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 22-23 (1977) (asking whether law was "reasonable" way to accomplish "legitimate public purpose"); *Principle Homecare, LLC v. McDonald*, 158 F.4th 326, 332 (2d Cir. 2025) (stating that Supreme Court "has declined to subject state legislation to heightened scrutiny under the Contracts Clause").

Here, the district court applied highly exacting scrutiny to the Deactivation Law, far more akin to strict scrutiny than the review required by the Contract Clause, based on its conclusion that the law worked a "severe impairment" of the companies' contracts (SPA31). To be sure, in *Melendez*, this Court described the standard of review as a sliding scale, where greater scrutiny is given to more substantial impairments, and lesser scrutiny to more minimal ones. 16 F.4th at

1035. But *Melendez* also made clear that strict scrutiny is out of bounds. *See* 16 F.4th at 1032. And, as discussed above, the district court greatly overstated the law's degree of impairment because it overstated the centrality of the deactivation provisions and failed to account for the numerous potential applications of the law that do not conflict, or conflict only minimally, with the companies' contractual rights. The court's application of excessively exacting scrutiny infected its entire analysis and constituted an abuse of discretion. *See Upsolve, Inc. v. James*, 155 F.4th 133, 144 (2d Cir. 2025).

**a. The City has a legitimate interest in protecting drivers from unfair deactivation.**

The law serves a legitimate public purpose. *See REBNY*, 182 F.4th at 163. The City has a legitimate interest in ensuring fair working conditions and preventing unfair deactivations. *See, e.g., Thornhill v. State of Alabama*, 310 U.S. 88, 103 (1940) ("[L]abor relations are not matters of mere local or private concern."); *West Coast Hotel*, 300 U.S. at 393 (legislature has wide discretion to pass laws "to insure wholesome conditions of work and freedom from oppression"); *Restaurant Law Center*, 90 F.4th at 106 (wrongful discharge law for fast-food workers was valid exercise of police power); *Figueroa v. Foster*, 864 F.3d 222,

(2d Cir. 2017) (state has substantial interest in eliminating employment discrimination); *see also Olson*, 104 F.4th at 78 (protecting workers and reducing income inequality are legitimate state interests); *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1150 (9th Cir. 2004) (municipality had broad authority to "protect workers").

Indeed, laws governing wages and hours, discrimination, workplace safety, collective bargaining, and workers' compensation have all been justified by the government's legitimate interest in this area. As this Court has put it, work is "central to the well-being of the nation and its citizen." *CompassCare*, 125 F.4th at 60. Laws safeguarding such a vital interest have a legitimate public purpose under Contract Clause analysis.

The Deactivation Law is of a piece with other worker-protection measures. The City Council heard extensive evidence that drivers can be deactivated without even minimal justification, including if they have the bad luck to pick up a bigoted passenger or a passenger who invents a complaint to get a refund. And the consequences of deactivation can be catastrophic for drivers, who often can't afford groceries and lose cars and homes once cut off from the companies' apps. In fact, the district court acknowledged that "[t]he legislative record documents real hardships associated with deactivation" (SPA 32) and that "th[e]

evidence supports the City Council's concern that some drivers experience inadequate notice, difficulty challenging deactivations, and serious financial hardships when they are deactivated" (SPA33).

The court nonetheless decided that the Deactivation Law lacked a legitimate public purpose because the law supposedly benefits only drivers and not the public at large (SPA34-36). While the court believed the law was a sop to a "favored group" (SPA36), there is nothing improper or unusual in a legislature taking steps to protect a vulnerable segment of its local workforce, as decades of worker-protection legislation confirm. *See, e.g., Barrett v. State of Indiana*, 229 U.S. 26, 29 (1913) (law protecting coal miners); *Restaurant Law Center*, 90 F.4th at 106 (wrongful discharge law for fast-food workers); *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77 (2d Cir. 2015) (wage parity law for home-care aides); *Ass'n of Car Wash Owners v. City of N.Y.*, 911 F.3d 74, 81-82 (2d Cir. 2018) (law regulating bond requirements for car washes to cover wage claims).

In finding otherwise, the court misread *REBNY* as upholding a tenant protection law because it benefited not just tenants but society as a whole (SPA33-34). In fact, the *REBNY* Court found that improving the housing market *for renters* was a legitimate purpose. 182 F.4th at 164. As this holding illustrates, to have a legitimate public purpose, a law

does not need to benefit everyone. The City Council is entitled to focus its efforts on groups that need help. And the City has about 90,000 Uber and Lyft drivers. The Council acted well within its police power by enacting protections for this large, vulnerable group.

The district court mistakenly thought that the number of drivers who stand to benefit from the law was far lower, reasoning that only drivers who are unjustly deactivated would be affected (SPA34). But the City Council heard testimony about the impact of the companies' deactivation practices on *all* drivers, not just those who experience unjust deactivation (UA1243, 1518; LA1632, 1907). The law will reduce stress on all drivers, who will be able to go through their workday without worrying that they will lose their livelihood based on a false complaint or a minor mistake. It will also empower them to protect their own welfare and make safe choices that protect the public without fear of rider retaliation, as some drivers experienced during the Covid-19 pandemic when asking riders to wear masks or when passengers urge drivers to break traffic laws (*see supra* at 8). The Council has a legitimate interest in easing the stress on, and empowering, this large and important workforce.

In addition to missing these wider benefits of requiring fair and transparent deactivations, the district court also erred by demanding

that the City Council pinpoint the number of deactivations that were unjust (SPA35). Again, that number is not dispositive because living with the risk of arbitrary and potentially unchallengeable deactivation harms drivers regardless of the exact number of unjust deactivations that occur.

In any event, the Council heard testimony strongly indicating that the problem of unjust deactivations is widespread. In fact, one survey that the Council considered indicated that two thirds of drivers had experienced at least a temporary deactivation, and that burden fell heaviest on drivers of color (UA1659; LA2048). DCWP believed about 13,000 New York City drivers were deactivated each year (UA1291; LA1680). Ultimately, the lack of exactness in the record reflects the black-box nature of the companies' contractual deactivation practices—precisely what the law aims to redress. The legislative record shows that even drivers often don't know why they were deactivated (UA1325, 1387, 1444-45, 14882, 1660; LA1714, 1776, 2049), so it's small wonder that the Council couldn't know for sure how many deactivations were unwarranted.

The district court also faulted the Council for failing to make a record of the potential impacts of the law on the industry or the public, suggesting that this meant the law could not have been intended to

advance "society's larger interest" (SPA36 (cleaned up)). But the Contract Clause just requires *a* public purpose, not that the legislature assess every potential effect on every member of the public. In fact, this Court recently rejected a similar argument, confirming that the Contract Clause "does not permit [a court] to second-guess the City's actions based on potential second-order effects." *REBNY*, 182 F.4th at 165. And the decision here illustrates the wisdom of this principle: the district court's predictions about the law's potential impact on public safety or the cost of ride sharing (SPA37-38) were speculative and far outside the court's ken.

Finally, the court also mistakenly found that the Council's supposed hostility to the companies was evidence that the law did not have a legitimate public purpose (SPA36). While the court believed the law applies "only to Uber and Lyft" (SPA36), it in fact applies to all high-volume for-hire vehicle services. N.Y.C. Admin. Code § 20-1282. The fact that only two companies in the City currently have this business model does not mean the law targets the two companies.

The court also cited a single Council Member's allegedly hostile statements as evidence of an improper purpose (SPA36). The statements in question—that the companies were unfairly deactivating drivers (SPA13, 36)—hardly suggest an ulterior motive. In any event,

evidence of a legislator's subjective motivation does not carry the day. *REBNY*, 182 F.4th at 165; *Gen. Media Comm'ns, Inc. v. Cohen*, 131 F.3d 273, 283 n.13 (2d Cir. 1997); *see also Nekrasov v. City of Jersey City*, 45 F.4th 662, 680 (3d Cir. 2022) (finding short term rental law had legitimate purpose despite mayor's hostility to Airbnb); *Ass'n of Equip. Manufacturers v. Burgum*, 932 F.3d 727, 733 (8th Cir. 2019) (statements of individual legislators were insufficient proof of statute's purpose). The law's purpose is both obvious and legitimate.

#### b. The City is entitled to deference on the need for the law, and the record shows the law was reasonable.

The district court erred in holding that the law was unreasonable, again applying an inappropriately exacting review. Under the Contract Clause, courts should defer to a legislature's assessment of the need for and reasonableness of a law so long as there is "some record basis to link purpose and means." *Melendez*, 16 F.4th at 1041; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987) (unless State is party to contract, "courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure"); *see also REBNY*, 182 F.4th at 159 ("[W]e defer to the city's judgment about the appropriate means to further its legitimate

governmental interest." (cleaned up)); *Conn. State Police v. Rovella*, 36 F.4th 54, 66-67 (2d Cir. 2022) (in absence of self-serving motive, courts "presume" law is valid unless plaintiff has "compelling evidence" that law was unnecessary and unreasonable). The district court gestured toward this deferential review (SPA38-39) but failed to apply it.

When applying the proper standard, this Court looks to five factors in determining whether a law is appropriate and reasonable: (1) whether the law impairs contracts on a temporary basis or permanently; (2) whether there is some record basis to link the legislature's purpose and its chosen means; (3) whether the burden of the law falls on the party causing that harm; (4) whether the relief provided is conditioned on need; and (5) whether the law provides compensation to the party whose contractual rights are impaired. *REBNY*, 182 F.4th at 166. "It is the totality of the factors that determines the strength of a plaintiff's claim." *Id.* (cleaned up).

Considering these factors, the record shows that the law is a reasonable means to achieve the Council's legitimate goal. While the Deactivation Law provides no compensation (factor five), the remaining factors support reasonableness—and thus reversal.

*First*, the law does not permanently impair the companies' contracts in all instances, *REBNY*, 182 F.4th at 166, for the same

reasons that it does not facially work a substantial impairment of the contracts (*see supra* at 33-47). The companies retain the right to deactivate drivers who engage in misconduct or provide poor service—they just have to be prepared to prove it later if challenged and sometimes use progressive discipline first. N.Y.C. Admin. § 20-1282. Requiring the companies to give notice and warnings before deactivating a driver is not a permanent impairment. It at most delays their ability to deactivate. The district court's finding that the law "permanently eliminates the [companies'] broader deactivation authority" (SPA39) is simply not accurate, at least not in all applications of the law.

*Second*, there is substantial record evidence linking the City Council's purpose to its chosen means, which should be the most important consideration, *see Melendez*, 16 F.4th at 1041 (court defers if there is "some record basis to link purpose and means"). The Council heard extensive evidence that some drivers are unfairly deactivated, and a just cause requirement is a reasonable way to prevent that. The rest of the law helps to enforce this requirement.

The district court found that the record supported a law requiring notice, an opportunity to respond, a review of whether the driver committed the alleged misconduct, and, at least in some cases, a

graduated disciplinary policy (SPA40-41). And those conclusions are supported by the record, which shows that at least some drivers are deactivated for unfair reasons—including passenger discrimination—and that they often do not know why they were deactivated. Two thirds of drivers, the vast majority of whom are immigrants or people of color, reported experiencing discrimination, sexual harassment, or other forms of mistreatment by passengers (UA1659; LA2048). And the record was clear that some passengers make false complaints to get refunds (UA1352, 1658-59; LA1741, 2047-48). Approximately 70% of deactivated drivers were given no notice before deactivation (UA1660; LA2049), and they were often given no explanation or just told that it was due to a customer complaint (UA1325, 1387, 1444-45, 1488, UA1660; LA1714, 1776, 1833-34, 1877, 2049).

The requirements of notice and informal resolution enable drivers to challenge a deactivation that is based on a false allegation. N.Y.C. Admin. Code §§ 20-1282, 20-1287. And the law's requirements for just cause and progressive discipline help to ensure that drivers are deactivated only for good reason and not arbitrarily or for trivial matters that they could address if given the opportunity to improve or correct mistakes. *Id*. §§ 20-1282, 20-1289.

The district court found fault with three other parts of the law (SPA40), but those provisions effectuate and give teeth to the just cause standard and notice requirement. The requirements are a reasonable means of preventing unjust deactivations, and the district overstepped its role in acting as a "super-legislature," going through the provisions with a fine-tooth comb and second-guessing the City Council's judgments. *See Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1226 (2d Cir. 1994). And even if the court had been right about any of these provisions, that would not justify an injunction against the entire law. *See* N.Y.C. Admin. Code § 1-105; *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 873, 885 (2d Cir. 2008).

The court first took issue with some of the factors that a factfinder must consider in deciding whether a deactivation was proper, including whether the company provided adequate training and fair and consistent progressive discipline and whether deactivation was a proportionate response given the circumstances and the driver's work history. N.Y.C. Admin. Code § 20-1282(b). But these factors—none of which is dispositive—are relevant to assessing whether deactivation is warranted by the driver's conduct and whether the driver was on notice of the possibility of deactivation for certain behavior. The court should not have imposed its own view of the wisdom of these provisions. If the

use of these factors could result in some driver being reinstated improperly (SPA41), that possibility would not make the entire law invalid.

The second provision the district court objected to mandates reinstatement if the company violates the notice requirement (SPA40). N.Y.C. Admin. Code § 20-1208(c)(1). The court acknowledged that "[t]he record supports requiring meaningful notice" (SPA42). But the notice requirement would be ineffective if there were no way to enforce it, and this provision gives the companies a strong incentive to comply. Regardless, nothing suggests that the companies would be unable to consistently provide notice or could not cure a notice defect, as allowed by DCWP's proposed rules (UA2098; LA2487). So, the possibility that a driver would be reinstated solely for lack of notice is at best a highly speculative edge case.

The last provision the district court faulted is the seven-year look back period, which permits drivers who believe they were deactivated without just cause before the law's enactment to petition for reinstatement prospectively (SPA42). N.Y.C. Admin. Code § 20-1283. This provision responds directly to record evidence that wrongful deactivations have been a longstanding problem and that many past, unappealable deactivations might have turned out differently if drivers

had had a meaningful way to challenge them (UA1659; LA2048). It was well within the City Council's considerable discretion to determine that the many drivers who were deactivated before the law's enactment should not be entirely shut out of the law's protections.

The Council's decision was informed by a study on deactivated drivers that showed most were long-time drivers with high ratings and no record of misconduct (UA1660; LA2049), which suggested that at least some of them had been deactivated without just cause. The district court gave this interest short shrift. And its stated concern for the companies' lack of access to records supporting past deactivation decisions (SPA42) was unsupported by the companies' evidence. Uber actually claimed that it has too many records to wade through to explain deactivations and that it might not have access to a tiny portion of records, like some old communications with drivers or "selfies" used to verify identity, in an unidentified number of cases (A638-39). Lyft provided no evidence about its records. In any event, DCWP's proposed rules would require a fact-finder to consider lack of records in deciding whether a driver is entitled to reinstatement (UA2098; LA2487).

*Third*, as the district court correctly recognized (SPA43), the law places the burden on the "persons ... responsible for the circumstances warranting relief": the companies. *REBNY*, 182 F.4th at 167 (cleaned

up). Their contracts, affording them wide or even total discretion over deactivation decisions, is the source of the problem the Deactivation Law aims to fix. And clearly drivers had no say in the terms of those agreements. It is appropriate for the City Council to place the law's burdens on the companies.

*Fourth*, under the law "the party burdened by the contractual impairment is better positioned financially than the relieved party to bear that burden." *REBNY*, 182 F.4th at 167. Surely, the companies are better positioned to bear any costs imposed by the Deactivation Law's protections. Drivers, on the other hand, face devastating financial consequences from deactivation and often lack the means to assert their rights. The district court acknowledged that "the legislative record documents drivers' economic vulnerability," yet it inexplicably still questioned whether they or the companies were better able to bear the law's costs (SPA43).

The totality of these factors weighs in favor of the Deactivation Law's facial constitutionality. *See REBNY*, 182 F.4th at 166. The district court's objections to various of the law's provisions fail to establish that the companies are likely to succeed on their facial challenge. As this Court has explained, courts should be wary of finding a law unconstitutional when it has never been implemented and judges can

only guess how it would be applied in an actual dispute. *See Antonyuk v. James*, 120 F.4th 941, 1000 (2d Cir. 2024). The district court committed reversable error by ignoring this principle.

### C. The balance of equities and the public interest strongly weigh against enjoining the law.

Even if the companies could show a likelihood of success on the merits and irreparable harm, their motion should still have been denied based on the balance of the equities and the public interest. *See Winter*, 555 U.S. at 23-24 (vacating injunction based on equities regardless of merits and potential harm). In cases like this, where the injunction would constrain the government, the two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And courts should pay special attention to the public consequences of an injunction. *Winter*, 555 U.S. at 24.

To start, the City suffers an irreparable injury when it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). The Deactivation Law was passed by an overwhelming majority of the City's elected representatives. The public has a strong interest in the enforcement of democratically enacted laws.

Moreover, the Deactivation Law addresses a real concern in the lives of vulnerable members of our community. As it stands, the

companies can unilaterally upend a driver's livelihood based on false or unfair allegations. The law gives drivers dignity and economic stability, protects them from passenger abuse, and maintains public safety by permitting the companies to immediately deactivate any driver who engages in egregious misconduct. The Council acted in the public interest by passing this law, which they crafted with input from the companies themselves. The City's interest in protecting drivers far outweighs the companies' speculation about hypothetical harms.

## POINT II

## IN THE ALTERNATIVE, THE INJUNCTION IS OVERLY BROAD

Even where an injunction is warranted, it must be narrowly tailored to permit lawful activity. *Victorinox AG v. B&F Sys.*, 709 F. App'x 44, 51 (2d Cir. 2017); *City of N.Y. v. Mickalis Pawn Shop*, 645 F.3d 114, 145 (2d Cir. 2011). But the district court issued an extremely broad injunction that prohibits enforcement of the law even in instances that would undeniably be constitutional. If this Court does not reverse, it should narrow the injunction considerably.

The district court extended the injunction to contracts that are categorically not covered by the Contract Clause. As explained above, contracts formed after a law's enactment are "unquestionably" outside

the Clause's scope. *Veix v. Sixth Ward Bldg. & Loan*, 310 U.S. 32, 38 (1940); *Harmon v. Markus*, 412 F. App'x 420, 423 (2d Cir. 2011). So even if the Deactivation Law could not apply to contracts made before the law was enacted on January 29, 2026, it can lawfully apply to contracts the companies enter into after that date. *See REBNY*, 186 F.4th at 162. This means that the preliminary injunction cannot extend to Lyft, which, as already discussed, imposed new contracts on all its drivers on February 9, 2026 (LA75).

It also means the injunction cannot extend to contracts that Uber enters into with new drivers in the future or when the company simply wants to update the contractual terms with its current drivers. The district court expressly addressed this scenario and decided to extend the injunction to these future contracts. That move is unsustainable under the Contract Clause. The court treated this as a matter of severability (SPA50-52), but that concept is irrelevant here. Nothing needs to be severed to apply the law in full to contracts post-dating its enactment. The Contract Clause simply has no bearing on those contracts.

The court's severability analysis also makes no sense as a matter of legislative intent. This Court presumes that the City Council would prefer constitutional portions of a law to go into effect, given that local

law expressly provides for severance when only part of a law is invalidated. *See* N.Y.C. Admin. Code § 1-105; *John Doe, I*, 549 F.3d at 873, 885; *Gen. Elec. Co. v. N.Y. State Dep't of Labor*, 936 F.2d 1448, 1460 (2d Cir. 1991). While the court seemed to believe the Council would not have wanted the law to apply only prospectively (SPA52), nothing in the record supports that claim. It would plainly better advance Council's goals for some workers—rather than none—to be protected from unjust deactivations.

## CONCLUSION

This Court should reverse and vacate the district court's order granting a preliminary injunction. In the alternative, the Court should narrow the injunction.

Dated: New York, New York
September 14, 2026

Respectfully submitted,

STEVEN BANKS
*Corporation Counsel*
*of the City of New York*
Attorney for Appellant

By: s/MacKenzie Fillow
MACKENZIE FILLOW
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
212-356-4378
mfillow@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
MACKENZIE FILLOW
*of Counsel*

## CERTIFICATE OF COMPLIANCE

The portions of the brief that must be included in a word count contain 13,744 words.

s/MacKenzie Fillow
MACKENZIE FILLOW