# 26-2079

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

UBER TECHNOLOGIES, INC., UBER USA, LLC,

*Plaintiffs-Appellees,*

-against-

CITY OF NEW YORK,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* UNIONS AND WORKERS' RIGHTS ADVOCATES IN SUPPORT OF DEFENDANT-APPELLANT CITY OF NEW YORK AND FOR REVERSAL**

Allison Langley, Esq.
Zubin Soleimany, Esq.
*Attorney(s) for Amici Curiae*
31-10 37th Avenue, Suite 300
Long Island City, NY 11101
(929) 274-3673
alangley@nytwa.org

# CORPORATE DISCLOSURE STATEMENT

Proposed *amici curiae* hereby disclose that none of them have a parent corporation and no publicly held corporation owns ten percent of its stock.

TABLE OF CONTENTS

IDENTITY AND INTEREST OF AMICI CURIAE ........................................... 1

PRELIMINARY STATEMENT ........................................................................ 2

ARGUMENT ................................................................................................. 4

I. WRONGFUL DEACTIVATIONS CAUSE SIGNIFCANT HARM ....... 4

A. Wrongful and Arbitrary Deactivations Devastate Drivers, Who Are Fired With Inadequate Notice And No Meaningful Process. ....................................................................... 4

B. High-Volume Services Have Dominated The FHV Market, Making Deactivation Tantamount To TLC License Revocation .................................................................................... 6

II. PLAINTIFFS-APPELLEES' CONTRACTS ARE NOT SUBSTANTIALLY IMPAIRED AS PLAINTIFFS-APPELLEES SHOULD REASONABLY HAVE EXPECTED REGULATION OF THEIR RELATIONSHIPS WITH DRIVERS ........................................ 8

A. Prior Comprehensive Regulation of High-Volume Services, Including Driver Welfare Standards, Made Further Regulation In This Area Reasonably Foreseeable ............................................ 9

B. City And State Laws Already Pertain To High-Volume Services' Relationships With Drivers, Including Driver Terminations ... 11

1. High-Volume Services Operate in a Heavily Regulated Industry That Oversees the Services' Relationships with Drivers ..................................................................... 11

2. TLC Rules and City Human Rights Law Regulate Termination Directly By Prohibiting Retaliatory Deactivations ............................................................ 12

3. Uber and Lyft Have Long Been Subject To State Review Of Termination Decisions Under The NY Unemployment Insurance ("UI") Law ........................................................ 14

C. The District Court's Overly Restrictive Analysis Would Hamstring The Legislative Progress ........................................ 16

III. ADDRESSING WRONGFUL DEACTIVATIONS ADVANCES A BASIC SOCIETAL INTEREST IN ADDRESSING THE ECONOMIC INSTABILITY OF UNEMPLOYMENT .............................................. 17

A. The District Court Misconstrued the Applicable Standard For Determining When A Law Advances A Societal Interest ......... 18

B. LL 52 Advances A Broad Societal Interest ................................ 19

1. Sector-Specific Minimum Labor Standards Are In The Broad Social Interest .................................................................. 19

2. LL 52 Benefits All High-Volume For-Hire Vehicle Drivers ......................................................................................... 21

3. LL 52 Does Not Target Plaintiff-Appellees Because It Applies To An Existing Regulatory Category ................... 22

4. No Case Law Requires A Court To Balance A Law's Stated Purpose Against Other Potential Societal Interests ............ 23

IV. LL 52 USES REASONABLE AND NECESSARY MEANS TO ADDRESS THE HARMS ESTABLISHED BY THE RECORD .......... 23

A. Statutes Routinely Authorize Factfinders to Review Training and Policies When Determining Whether Workers Were Discharged For Just Cause. ..................................................................... 24

B. LL 52 Resembles Current TLC Processes, Which Balance Drivers' Right To Their Livelihoods With Public Safety ........................ 25

C. Reinstatement Is A Reasonable Remedy Where The Companies Failed To Provide Adequate Notice ........................................ 27

D. Providing Relief To Previously Deactivated Drivers Is A Reasonable Remedy For The Harm Of Prior Unjust And Arbitrary Deactivations ......................................................................... 28

E. The Record Is Plain That Deactivations Devastate Low-Wage Workers, While Uber And Lyft Are Well-Situated To Absorb Any Costs of LL 52 ................................................................... 29

F. Despite The District Court's Speculation, LL 52 Will Likely Make New York City Safer, As Adequate Training, And Clear Workplace Policies Create Demonstrably Safer Workplaces .... 30

CONCLUSION ................................................................................ 32

CERTIFICATE OF COMPLIANCE ..................................................... 33

APPENDIX ........................................................................................ -1-

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Structural Steel Co. v. Spannaus*
438 U.S. 234 (1978) ....................10, 17, 18

*Buffalo Teachers Fed'n v. Tobe* 464 F.3d 362, 369 (2d Cir. 2006)
464 F.3d 362 (2d Cir. 2006) .................... 23-24

*Energy Reserves Group v. Kan. Power & Light Co.*
459 U.S. 400 (1983) ....................18

*Home Bldg. & Loan Assoc. v. Blaisdell*
290 U.S. 398 (1934) ....................18

*Islam v. Cuomo*
475 F. Supp. 3d 144 (E.D.N.Y. 2020)....................15

*Matter of Kramer*
202 A.D.3d 1230 (3d Dep't 2022) ....................16

*Matter of Lowry*
189 A.D.3d 1863 (3d Dep't 2020) ....................15

*Matter of Lowry*
37 N.Y.3d 1045 (2021) ....................15

*Melendez v. City of New York*
16 F.4th 992 (2d Cir. 2021)....................9, 10, 11, 17

*Minnesota Asso. of Health Care Facilities, Inc. v. Minnesota Dep't of Public Welfare*
742 F.2d 442 (8th Cir. 1984).................... 21-22

*New Prime, Inc. v. Oliveira*
586 U.S. 105 (2019) ....................14

*Nnebe v. Daus*
644 F. 3d 137 (2d Cir. 2011)....................26, 31

*Nnebe v. Daus*
931 F. 3d 66 (2d Cir. 2019)....................19, 26, 27, 31

*Real Est. Bd. of N.Y., Inc. v. City of N.Y.*
182 F.4th 140 (2d Cir. 2026)....................10, 23

*Rest. L. Ctr. v. City of New York*
90 F.4th 101 (2d Cir. 2024)....................13

*RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1151 (9th Cir. 2004).
371 F.3d 1137 (9th Cir. 2004)....................17

*Sanitation & Recycling Indus., Inc. v. City of New York*
107 F.3d 985 (2d Cir. 1997).................... 9-10

*Walling v. Brooklyn Braid Co.*
152 F.2d 938 (2d Cir. 1946)....................19

**Statutes**

Local Law 52 of 2025 ....................*passim*

29 U.S.C. § 215(a)(3)....................13

N.Y.C. Admin. Code § 8-120....................13

N.Y.C. Admin. Code § 20-1271....................19

N.Y.C. Admin. Code § 20-1272....................25

N.Y.L.L. § 215 ....................16

N.Y.L.L. § 501 ....................19

N.Y.L.L. § 581 ....................16

N.Y.L.L. § 740 ....................16

Mont. Code Ann. § 39-2-903 ....................25

24 V.I.C. § 76....................25

**Rules and Regulations**

35 R.C.N.Y. § 51-03 ........................................................................................7

35 R.C.N.Y. § 59B-11(c) ...............................................................................12

35 R.C.N.Y. § 59B-13(n) ...............................................................................13

35 R.C.N.Y. § 59D-13(c) ...............................................................................12

35 R.C.N.Y. § 59D-10(l)................................................................................13

35 R.C.N.Y. § 59D-22....................................................................................12

35 R.C.N.Y. § 68-15(a) ..................................................................................26

35 R.C.N.Y. § 68-15(d) ..................................................................................26

48 R.C.N.Y. § 1-46 ........................................................................................27

48 R.C.N.Y. § 6-11 ........................................................................................27

48 R.C.N.Y. § 6-12(a) ....................................................................................27

**Other Authorities**

NYS Unemployment Insurance Appeal Board Nos. 596722-596727
(July 1, 2018) ..........................................................................................15

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

Proposed *amici curiae* are unions and workers' rights advocates that operate in New York City ("Advocate Amici").[2] Advocate Amici have decades of experience pursuing workers' rights through the legislative process and, for union *amici*, through collective bargaining. Advocate Amici share the common goal of improving standards for working people in New York, including advocating for sector-specific minimum labor standards, and have substantial experience advocating for wrongfully terminated employees. *Amicus* New York Taxi Workers Alliance has represented Uber and Lyft drivers for over 10 years, and is well-positioned to explain the relevant industry and regulatory background as it relates to errors in the District Court's Contract Clause analysis.

As unions and workers' rights advocates, Advocate Amici have a substantial interest in ensuring that state and local governments retain the right to regulate minimum labor standards within the full scope of their police power. Advocate Amici submit this brief to explain the harms that drivers have faced regarding unjust deactivations, the regulatory background relevant to a Contract Clause analysis in

---

[1] No parties' counsel authored this brief in whole, or in part. Amici did not receive money from any party, individual, or entity intended to fund the preparation or submission of this brief.

[2] Advocate Amici consist of the New York Taxi Workers Alliance, ALIGN: the Alliance for a Greater New York, the International Brotherhood of Teamsters, Workers Justice Project, and Region 9A of the International Union of United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW").

this matter, and why the District Court's decision to grant Plaintiffs' motion for a preliminary injunction was incorrect.

## PRELIMINARY STATEMENT

Plaintiffs-Appellees Uber and Lyft are established companies in the for-hire vehicle ("FHV") market in New York City. They employ over 88,000 drivers, perform over 700,000 trips a day, and in May 2026 alone, generated nearly a billion dollars in passenger fare.[3] Indeed, Plaintiff-Appellees' dominance of the FHV market created seismic, destabilizing changes across the industry and attendant shifts in regulations. An increase in for-hire vehicles flooded the streets, while driver pay fell so substantially that 85% of drivers working for companies like Uber and Lyft made less than the minimum wage. *See* James Parrott and Michael Reich, *An Earnings Standard for New York City's App-Based Drivers* (July 2018) at 6, https://www.centernyc.org/an-earnings-standard. These economic pressures were so severe that, in a single year, multiple drivers died by suicide.[4]

In response to this crisis, the City Council enacted common-sense legislation to meet these changing conditions, including regulating the number of for-hire

---

[3] See *Taxi and Ridehailing Usage in New York City* (website) https://toddwschneider.com/dashboards/nyc-taxi-ridehailing-uber-lyft-data/ (Accessed: Sept. 16, 2026) (compiling TLC data and showing that in May 2026, Uber generated $567,617,195 in passenger fare and Lyft generated $227,738,620, for a total of $795,355,815).

[4] Tyler Pager and Emily Palmer, *Uber Driver's Death Marks Seventh For-Hire Driver Suicide Within a Year*. N.Y TIMES (Oct. 7, 2018), https://www.nytimes.com/2018/10/07/nyregion/uber-driver-suicide-for-hire-taxis-new-york.html.

vehicles on the roads and setting minimum driver pay standards for High-Volume Services. Local Law 52 ("LL 52") is no different.

LL 52 expands existing City protections against unfair firings for fast food workers to high-volume for-hire vehicle drivers, the City's largest private workforce. It is in line with existing state and City oversight of Plaintiffs-Appellees' termination of drivers, and the City's longstanding TLC license revocation processes. After over a decade in operation, Plaintiffs-Appellees are inarguably familiar with the operating requirements in the industry, which is heavily regulated and has been for over a hundred years.[5] Yet Plaintiff-Appellees' challenge rests largely on the argument that this common-sense expansion was "unforeseeable." This is simply not the case.

The District Court erred when it enjoined LL 52, finding that Plaintiffs-Appellees would likely succeed on their Contract Clause claims. LL 52 does not substantially impair Plaintiffs-Appellees' contracts and was a foreseeable furthering of existing minimum labor standards in a comprehensively regulated industry. Further, the City Council acted with a legitimate public purpose when it sought to protect drivers from the harms of unfair deactivations, which are well-established in the record. Sector-specific minimum labor standards are common and necessary legislative interventions that serve a broader public interest even as they apply

---

[5] The NYPD Hack Bureau, the Taxi and Limousine Commission's predecessor agency, was created in 1925. *See* Frank J. Prial, *When the Taxi Customer Complains, the Hack Bureau Listens*. N.Y. TIMES (Jan. 13, 1971), https://www.nytimes.com/1971/01/13/archives/when-the-taxi-customer-complains-the-hack-bureau-listens-when-cab.html.

directly only to smaller subsets of the population. Finally, LL 52's measures are reasonable and necessary to address the harms of deactivation. Accordingly, this Court should reverse the District Court's injunction.

## ARGUMENT

### I. WRONGFUL DEACTIVATIONS CAUSE SIGNIFICANT HARM

#### A. Wrongful And Arbitrary Deactivations Devastate Drivers, Who Are Fired With Inadequate Notice And No Meaningful Process

The City Council enacted LL 52 in response to a crisis: High-Volume Services' drivers were experiencing arbitrary deactivations, without adequate notice or effective appeal processes. These deactivations devastated drivers: driver after driver testified that deactivations made it "hard [...] to survive[,]" describing how they struggled to support their families and keep up with loan and insurance payments for cars purchased solely to work for Uber and Lyft. *See*, *e.g.*, Transcript of the Minutes of the Committee on Transportation and Infrastructure (Sept. 27, 2024), 1:26-cv-04893, ECF 1-6, at 196:2-6, 195:5-6, 122:11-14 ("Transcript"). On top of the crushing economic impact of being suddenly deprived of their livelihoods, drivers described wide-reaching harm caused by deactivations, reporting no longer being able to afford essential support for relatives, like money for medication; a child dropping out of college; and their own struggles with mental health. *See Deactivated Without Cause: The Data Behind Unjust Firings of Drivers* (Oct. 28, 2025), at 9, 12,

https://cdn.sanity.io/files/iroghafc/production/f547c6af0400fcc8d86484e1d03781bffb0194f7.pdf. This crisis is significant not only in its harms to individual drivers, but because, collectively, Uber and Lyft employ over 88,000 drivers;[6] Uber drivers alone are New York's largest private-sector workforce. *See* Parrott and Reich, *supra*, at 6.

Unjust deactivations continue because Plaintiffs-Appellees' procedures for providing notice regarding deactivations are flatly insufficient. Even when Plaintiffs-Appellees notify drivers about an alleged incident leading to deactivation– which they do not in many, if not most, deactivation cases–drivers report only receiving the date and vague descriptions of alleged incidents. Drivers average 1.7 trips per hour;[7] a full-time driver would have no way of knowing which of their 20+ trips that day such a notice referred to. As a result, drivers often cannot effectively challenge allegations, even when possessing evidence like dash cam footage. *See, e.g.*, Transcript at 137:3-5. That Plaintiffs-Appellees' notice lacks key information is not a contested fact; it is supported by the record. *See* Uber Compl., 1:26-cv-04893 ECF 1 at ¶¶111-113 (screenshots showing that the notices Uber allegedly provides

---

[6] *See Taxi and Ridehailing Usage, supra,* (showing that 88,089 drivers worked for Uber and Lyft in May 2026) (Accessed: Sept. 17, 2026).

[7] *Id.* (showing 1.7 trips/hour for "ridehailing vehicles" in the most recent month, at graph titled "Trips per vehicle per active hour.") (Accessed: Sept. 17, 2026).

contain limited information, including dates without timestamps and generic descriptions of alleged misconduct).

Plaintiffs-Appellees' procedures for challenging deactivations are similarly illusory. By Uber's admission, Uber ultimately controls what types of cases are eligible for consideration in its existing appeal process. *See* 1:26-cv-04893, ECF 1-3, Committee Report of the Infrastructure Division of the Committee on Transportation and Infrastructure (Dec. 18, 2025) at 7, citing Uber's website *Driver Deactivation Review Panel* (June 29, 2020), available at https://www.uber.com/blog/new-york-appeals/ (describing decisions ineligible for appeal, including decisions "related to criminal activity while on the app, like theft or reckless driving," and "physical or sexual altercations," stating that "[u]ltimate determination of eligibility will be determined by Uber on a case-by-case basis.") Such a policy means that drivers simply cannot contest, *e.g.*, allegations of fraud, assault, or reckless driving.

On this record, the District Court recognized that there are "real hardships associated with deactivation," finding that "drivers experience inadequate notice, difficulty challenging deactivations, and serious financial hardship when they are deactivated." Memorandum Opinion and Order, ECF 48, ("Opinion") at 32-33.

### B. High-Volume Services Have Dominated The FHV Market, Making Deactivation Tantamount To TLC License Revocation.

Where once the FHV market in New York City consisted of many small bases, High-Volume Services now dominate, performing 93% of FHV trips. TLC Factbook, https://app.powerbigov.us/view?r=eyJrIjoiYTYwODgwNDMtYWQzNC00OGQxLTg2ZGYtMTcwZmE2OWU1NTJhIiwidCI6IjMyZjU2ZmM3LTVmODEtNGUyMi1hOTViLTE1ZGE2NjUxM2JlZiJ9 (Accessed: Sept. 17, 2026).[8] *See also* Transcript of Taxi and Limousine Commission Hearing (July 23, 2019), at 82; 84 (Livery Base Owners association president testifying in support of rules that allowed livery drivers to also receive dispatches from black-car services such as Uber and Lyft, noting that by 2019, High-Volume Services "gobbled up market share" and left small bases struggling to survive), https://www.nyc.gov/assets/tlc/downloads/About/commission_meeting_transcript/transcript_07_23_2019.pdf.

LL 52 applies only to High-Volume Services, a regulatory category that currently only includes Uber and Lyft. *See* 35 R.C.N.Y. § 51-03 (defining a High-Volume For-Hire Vehicle Service as a base that dispatches 10,000 or more trips/day). Because of High-Volume Services' dominance, if drivers are deactivated from Uber or Lyft, there is no viable way for them to earn a living as FHV drivers.

---

[8] In May 2026, HVFHV bases performed 22,125,744 trips; non-HVFHV bases performed 1,623,040 trips.

And because Uber and Lyft share deactivation information, deactivation from one platform often means deactivation from both, meaning drivers lose access to 93% of all FHV trips. *See* https://www.lyft.com/blog/posts/lyft-and-uber-launch-industry-sharing-safety-program-in-the-us (Accessed: Sept. 15, 2026).

A deactivated High-Volume driver would struggle even to work as a yellow cab driver, as dispatches from High-Volume Services now make up a significant portion of yellow cab trips. *See*, *e.g.*, Transcript of Taxi and Limousine Commission Hearing at 33:12-14 (July 16, 2025); (Uber representative describing trips dispatched to yellow cabs ), https://www.nyc.gov/assets/tlc/downloads/About/commission_meeting_transcript/transcript_07_16_25.pdf. When noting that "a deactivated driver remains free to work for other rideshare platforms [or] traditional car services" the District Court ignored an essential fact: there simply is not much other work available. Opinion at 3.

## II. PLAINTIFFS-APPELLEES' CONTRACTS ARE NOT SUBSTANTIALLY IMPAIRED AS PLAINTIFFS-APPELLEES SHOULD REASONABLY HAVE EXPECTED REGULATION OF THEIR RELATIONSHIPS WITH DRIVERS

The District Court's finding that LL 52 effects a substantial impairment on Plaintiffs-Appellees' contracts disregards the substantial pre-existing regulation of High-Volume Services' relationships with drivers. This Court's analysis regarding

substantial impairment and a party's reasonable expectations largely turns on the extent of prior regulation. High-Volume Services have long operated in a highly regulated environment under a specific regulatory category, and laws already inhibit Plaintiffs-Appellees' claimed right to terminate drivers in their sole discretion. In light of these existing restrictions, Plaintiffs-Appellees could reasonably have expected LL 52's further regulation in this area.

### A. Prior Comprehensive Regulation Of High-Volume Services, Including Driver Welfare Standards, Made Further Regulation In This Area Reasonably Foreseeable

In determining whether a challenged law substantially impairs a contract, the "primary consideration" is "the extent to which reasonable expectations under the contract have been disrupted." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997). Whether such expectations are reasonable depends "in part, on whether legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry." Opinion at 27 (citation omitted).

The District Court erred when it held that prior regulation that does not address deactivation standards specifically is irrelevant to this analysis, incorrectly interpreting this Court's decision in *Melendez v. City of New York* to mean that "the relevant question" in determining whether the legislative action was foreseeable is

"whether prior regulation 'pertained to' the contractual right at issue so as to alert the party 'to the possibility of state action in that regard.'" Order at 27, *quoting Melendez*, 16 F.4th 992, 1034-35 (2d Cir. 2021). *Melendez,* however, does not make a new requirement that prior regulation pertaining to the contractual right at issue is necessary to find that there is no substantial impairment. It merely says a court is not "compelled" to find a lack of impairment where a field had previously been "**sometimes**, and to **varying degrees**" regulated. *Melendez,* 16 F.4th at 1034 (emphasis added). This is distinct from industries subject to more comprehensive regulation such as the for-hire vehicle industry, which is regulated by a dedicated City agency. Indeed, in *Sanitation*, *supra*, this Court noted "although the City has never before regulated the duration of carters' contracts, carters have been for decades subject to the City's regulations and may be held to have anticipated regulation of this sort." 107 F.3d at 994. This is easily distinguishable from cases where regulation was found not to be foreseeable because it "invaded an area never before subject to regulation by the state" or where regulation occurred "sometimes, and to varying degrees." *Melendez*, at 1034 (*quoting Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978)); 1035.

Further, while *Real Est. Bd. of New York v. City of New York* noted that "[t]he fact that real estate is heavily regulated in New York does not shield **any** regulation of that market from scrutiny under the Contracts Clause," 182 F.4th 140, 164 (2d

Cir. 2026) (emphasis added), both *Melendez* and *REBNY* address regulations that undermine the contracts' "obligatory force," by voiding payment arrangements and personal guaranties, respectively. *REBNY* at 164; *see Melendez*, 16 F.4th at 1034-35. This is distinct from the regulation at issue here, which merely modifies the procedures High-Volume Services must follow to deactivate drivers. Such regulations do not undermine the obligatory force of the contract, of which the claimed right to deactivate drivers is just one term.

Accordingly, the fact that the industry is heavily and comprehensively regulated should be determinative.

### B. City And State Laws Already Pertain To High-Volume Services' Relationships With Drivers, Including Driver Terminations

Even if the correct standard for determining whether prior regulation created expectations of further regulation depended on whether prior regulation pertained to the contractual right at issue, such standard would be met here. The relationship between High-Volume Services and drivers, including driver deactivations, is already regulated in New York City and Uber and Lyft should have reasonably expected further regulation.

#### 1. High-Volume Services Operate in a Heavily Regulated Industry That Oversees the Services' Relationships with Drivers

Plaintiffs-Appellees operate in a heavily regulated industry. Both are subject to regulation as High-Volume For-Hire Vehicle Services, a regulatory category that

encompasses For-Hire Vehicle services that dispatch 10,000 trips or more per day. All High-Volume Services'[9] relationships with their drivers are thoroughly regulated. Notwithstanding what their contracts might say, unlike any other market in the U.S., TLC regulations limit what drivers Uber and Lyft may contract with to only those drivers licensed by the TLC. 35 R.C.N.Y. § 59B-11(c). In no other U.S. market does Uber operate exclusively with commercially licensed drivers. Notwithstanding Uber and Lyft's existing contracts with drivers of gas-powered vehicles, the TLC passed rules in 2023 that require High-Volume Services to dispatch trips only to drivers of electric or wheelchair-accessible vehicles by 2030. 35 R.C.N.Y. § 59D-13(c). Similarly, notwithstanding their existing contracts, since 2019, TLC rules have limited Plaintiffs-Appellees' discretion in how they pay drivers, mandating minimum levels of pay. 35 R.C.N.Y. § 59D-22.

### 2. TLC Rules and City Human Rights Law Regulate Termination Directly By Prohibiting Retaliatory Deactivations

Prior regulations directly impact Plaintiffs-Appellees' power to terminate drivers at-will. TLC regulations prohibit High-Volume Services from retaliating against drivers for making complaints against High-Volume Services. 35 R.C.N.Y.

[9]Currently, Uber and Lyft are the only two companies that qualify as HVFHV bases; in the past, Juno and Via qualified as such, and should new entrants reach the trip threshold they would likewise be subject to LL 52.

§ 59D-10(l). The rule applies to retaliatory deactivations, as it construes retaliation as "imposing any adverse condition or consequence" and requires restitution. Similar regulations applied to Plaintiffs-Appellees before the High-Volume category existed, under rules applicable to all For-Hire Vehicle Bases. 35 R.C.N.Y. § 59B-13(n). Such rules plainly stake out the City's interest in limiting FHV services' unfettered ability to deactivate drivers. These rules, like LL 52, require an OATH fact-finder to determine whether or not such deactivation was unlawful, despite the broad discretion over termination Plaintiffs-Appellees drafted in their driver contracts. Similarly, Plaintiffs-Appellees are already subject to the New York City Human Rights Law, which notwithstanding their contracts with drivers, would prohibit driver terminations that violate the HRL's prohibitions on discrimination. Similar to LL 52, remedies include backpay and reinstatement. N.Y.C. Admin. Code § 8-120.

This Court has previously noted that the City's fast food worker wrongful termination law was not "unprecedented," but was "analogous to the numerous statutory measures enacted over the past century limiting employers' ability to discharge their workers." *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 116 (2d Cir. 2024) (citing, *inter alia*, anti-retaliation provisions of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3), which operate similarly to those contained in TLC rules). Accordingly, as High-Volume Services were already subject to anti-retaliation

protections against deactivation, further regulation limiting other unjust deactivations could not have been unanticipated.

Plaintiffs-Appellees will likely argue that comparisons to the fast-food worker wrongful termination law are inapposite because Uber and Lyft treat drivers as independent contractors. While the District Court accepted this assertion at face value, it is neither true nor of legal significance. Opinion at 29. No court has found that Plaintiffs-Appellees' New York drivers are independent contractors under state labor law; the only published decisions regarding employment status found drivers to be employees. *See infra*, at 15. Regardless, drivers' employment status does not impact a Contract Clause analysis. Drivers work pursuant to their contracts with Plaintiffs-Appellees; nothing in the Contract Clause jurisprudence would even begin to imply a distinction between employment and independent contractor agreements, a distinction that would not exist for more than a century after the Clause was written. *See New Prime, Inc. v. Oliveira*, 586 U.S. 105, 113-16 (2019) (finding the term "contracts of employment" in the Federal Arbitration Act embraced modern-day statutory employees and independent contractors, as statutory employment schemes were not widely developed in 1925 when the Act was written).

### 3. Uber and Lyft Have Long Been Subject To State Review Of Termination Decisions Under The NY Unemployment Insurance ("UI") Law

In finding Uber and Lyft to employ drivers under the UI Law, New York State has long overseen Plaintiffs-Appellees' terminations of drivers. *See Matter of Lowry*, 189 A.D.3d 1863 (3d Dep't 2020) (affirming decisions finding Uber driver to be an employee), *leave denied* 37 N.Y.3d 1045 (2021); NYS Unemployment Insurance Appeal Board Nos. 596722-596727 (July 1, 2018), https://uiappeals.ny.gov/system/files/documents/2023/09/596722-appeal-decision.pdf (finding Uber drivers to be employees and finding Uber liable for contributions to UI fund where drivers became unemployed through no fault of their own). *See also Islam v. Cuomo*, 475 F. Supp. 3d 144, 149-50 (E.D.N.Y. 2020) (noting that, by 2020, the NYS Department of Labor ("DOL") had determined hundreds of Uber drivers and scores of Lyft drivers to be employees under the UI law and granting a preliminary injunction requiring DOL to, *inter alia*, apply those fact findings to future determinations). In 2023, Uber agreed to comply with UI law. *See Governor Hochul Announces Unprecedented Settlement Agreement Between NYS Department of Labor and Uber* (Nov. 2, 2023), https://www.governor.ny.gov/news/governor-hochul-announces-unprecedented-settlement-agreement-between-nys-department-labor-and.

Subject to the UI law, Plaintiffs-Appellees' decisions about terminating employees are overseen by the DOL, including review by independent fact-finders, much as they would be under LL 52. This includes making factual determinations

regarding whether employees committed misconduct disqualifying them from receiving benefits. *See*, *e.g.*, *Matter of Kramer*, 202 A.D.3d 1230 (3d Dep't 2022). This regulation includes the assessment of penalties in the form of higher or lower employer contributions to the UI trust fund based on their experience rating, which is based on the incidence of UI claims where benefits were paid. *See* N.Y.L.L. § 581. Similar to TLC rules, the NY UI law also prohibits retaliatory termination. N.Y.L.L. §§ 215, 740. All this means that the state already reviews and independently adjudicates whether Plaintiffs-Appellees' terminations adequately allege misconduct or not and penalizes them where they have not.

### C. The District Court's Overly Restrictive Analysis Would Hamstring The Legislative Progress

While LL 52 pertains to an area in which the state already regulates Plaintiffs-Appellees' conduct, the District Court's erroneous reading that prior regulation must "directly pertain[...]" to the contractual right affected by challenged legislation to not be considered a substantial impairment has profound implications for legislatures' ability to respond to changes in the economy. As new technologies, social problems, and regulatory sectors emerge, any legislative response would automatically be considered a substantial impairment because the legislature could not possibly have previously regulated sectors or issues that did not yet exist.

The District Court's reading of the substantial impairment prong misunderstands its purpose. That the Courts have not applied such a restrictive substantial impairment analysis to a minimum labor standard is not surprising; the modern focus on a party's "reasonable expectations" hinges largely on whether a pre-existing obligation is impaired such that a party's reliance interests are affected, such as by the direct imposition of financial costs, or the disruption of expected income. *See*, *e.g.*, *Allied Structural*, 48 U.S. at 247 (finding substantial impairment where state pension law imposed $185,000 in pension funding costs beyond contracted-for obligations); *Melendez*, *supra* (finding substantial impairment where personal guaranties upon default were void); *REBNY*, *supra* (finding substantial impairment where certain brokers' payment arrangements were prohibited). LL 52's prospective application effects no similar disturbance to reliance interests, but creates a largely prospective minimum standard, expanding existing prohibitions on certain terminations and creating an independent review process.[10] LL 52, at most, imposes only compliance costs, which do not constitute a substantial impairment. *See RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1151 (9th Cir. 2004).

## III. ADDRESSING WRONGFUL DEACTIVATIONS ADVANCES A BASIC SOCIETAL INTEREST IN ADDRESSING THE ECONOMIC INSTABILITY OF UNEMPLOYMENT

---

[10] Insofar as the District Court found LL 52's provisions concerning prior deactivations to violate the Contract Clause, these provisions are readily severable.

### A. The District Court Misconstrued The Applicable Standard For Determining When A Law Advances A Societal Interest

Modern Contract Clause jurisprudence concerning whether a challenged law serves a legitimate purpose begins by looking at whether "the legislation was not for the mere advantage of particular individuals but for the protection of a basic interest of society." *Home Bldg. & Loan Assoc. v. Blaisdell*, 290 U.S. 398, 445 (1934). *Blaisdell*'s focus on "particular individuals" asks whether the law is a valid exercise of the police power, in the public interest, or whether it seeks to disrupt contracts to the advantage of a select few, in a manner not dissimilar to the prohibition on bills of attainder. Essentially, the Courts look to balance "the language of the Contract Clause against the State's interest in exercising its police power[.]" *Energy Reserves Group v. Kan. Power & Light Co*., 459 U.S. 400, 410 (1983).

Cases following *Blaisdell* re-cast the term "basic societal interest" as "broad societal interest," while not substantially changing *Blaisdell*'s analysis. *See Allied Structural*, *supra,* at 249. *Cf. Blaisdell*, at 445. The District Court leans selectively on the word "broad" to mean that a law may not have a significant and legitimate public purpose if it does not apply broadly, which the District Court takes to mean as having an impact on society beyond the directly affected individuals on whom LL 52 confers deactivation protections. But *Blaisdell* and its progeny merely require that a law serves a basic (or "broad") societal *interest*; they do not require

an interest that **directly** impacts all or much of society. Legislatures, for example, often pass consumer benefit or minimum labor standard legislation that affects a subset of society, but serves a broadly shared societal interest.

### B. LL 52 Advances A Broad Societal Interest

#### 1. Sector-Specific Minimum Labor Standards Are In The Broad Social Interest

Implementing minimum labor standards, even those that apply to specific sectors, is in the public interest. *See*, *e.g.*, *Walling v. Brooklyn Braid Co.*, 152 F.2d 938, 940 (2d Cir. 1946) (finding it "self-evident that the public interest is directly concerned" in the enforcement of a wage order specific to embroidery workers). LL 52 serves a broad societal interest in preventing the economic instability and poverty that result from unwarranted terminations. New York legislatures have asserted, repeatedly, the broad societal interest in protecting workers from and disincentivizing unwarranted terminations and the economic consequences that follow. *See* N.Y.L.L. § 501; N.Y.C. Admin. Code § 20-1271 *et seq.* Moreover, as this Court has noted, City government has asserted its interest in ensuring that TLC-licensed drivers charged with wrongdoing face a process with adequate notice and opportunity to respond when facing a potential loss of livelihood. *Nnebe*, 931 F.3d 66 (2d Cir. 2019). As noted above, given the High-Volume sector's market dominance, deactivation presents the same broad concern regarding loss of livelihood as license revocation did in *Nnebe*.

There is simply no basis in controlling case law for the line-drawing problem the District Court would create around whether a law serves a large enough segment of society rather than, as the case law requires, an interest of society. A law **advances** a broad societal interest even where it does not aim to solve the targeted social ill for every member of society. Legislatures often pursue social reform, and minimum labor standards in particular, through sector-specific laws. *See*, *e.g.* N.Y. Construction Industry Fair Play Act and New York Transportation Industry Fair Play Act, N.Y.L.L. Arts. 25-B; 25-C (addressing employee misclassification by establishing stricter tests for employment status in the transportation and construction industries). As the District Court would have it, such laws would be void as not addressing broad societal problems, because they do not address the problem of worker misclassification more broadly. Further, idiosyncrasies specific to certain workforces will sometimes require tailored legislation: an hourly minimum wage framework that applies broadly to all workers, for example, may be less viable for app-based drivers with flexible schedules. The District Court's analysis would make these types of tailored legislative solutions impossible.

Despite the widespread history of sector-specific minimum labor standards, the District Court dismissed LL 52 as not advancing a societal interest because the "group likely to require its protections is [not] large in the context of the public served by the City Council." Opinion at 2. The Court provides no citation for its

view that to advance a societal interest, a law's most direct beneficiaries must be a large percentage of the legislature's jurisdiction. While some cases identify broader societal benefits to laws that survive Contract Clause challenges and strike down laws more specifically tailored to apply to a single party, a sector-specific minimum labor standard is distinct. *See* § II(C), *supra*. The District Court's view would invalidate TLC's driver pay rules, the fast food wrongful termination law, and any other sector-specific approach to workplace regulation.

#### 2. LL 52 Benefits All High-Volume For-Hire Vehicle Drivers

Even if the District Court's standard were appropriate, which it is not, the District Court misunderstood the scope of LL 52's direct beneficiaries. To say that LL 52 would only benefit those wrongfully deactivated misunderstands the nature of social benefit legislation. In the District Court's view, anti-discrimination laws only protect the actual victims of discrimination, not all workers who benefit from their deterrent effects—this is plainly not so. Over 88,000 drivers work for High-Volume Services, not including the thousands of taxi drivers who now also receive dispatches from them, and Uber's employment of drivers alone makes it the state's largest private employer. This includes more than 1 in every 100 New Yorkers, and 2% of the New York City workforce.[11] *Cf. Minnesota Asso. of Health Care*

[11] *See* https://comptroller.nyc.gov/newsroom/newsletter/new-york-by-the-numbers-monthly-economic-and-fiscal-outlook-no-110-february-2026/?emci=b19dc444-2c08-f111-832e-0022482a9733&emdi=d9d5f2ba-5b08-f111-832e-0022482a9733&ceid=6228085&ref=vitalcitynyc.org (showing 4.28 million private sector jobs).

*Facilities, Inc. v. Minnesota Dep't of Public Welfare*, 742 F.2d 442, 451 (8th Cir. 1984) (assuming societal interest where law directly benefitted non-Medicaid nursing home residents, who made up a similar percentage of the state population when compared to the percentage of drivers in the City).[12]

### 3. LL 52 Does Not Target Plaintiff-Appellees Because It Applies To An Existing Regulatory Category

The District Court likewise sees LL 52's applications to High-Volume Services, rather than all FHV bases, as indicating that it targets a narrow class. Opinion at 36. Rather than singling out specific employers, LL 52 applies to an established regulatory category. High-Volume Services have long been subject to more robust regulation than other FHV bases (*see* 35 R.C.N.Y. Chapter 59D); LL 52's applicability is similar to myriad minimum labor standards that contain small business exemptions, such as the TLC's minimum driver pay standards, which Plaintiffs-Appellees have never challenged under the Contract Clause. Notably, other companies have previously been categorized as High-Volume Services. Should other services provide 10,000 trips per day, the category will expand to include them; Uber and Lyft should not be allowed to use their market dominance

[12] All Minnesota nursing home residents yielded around 1% of Minnesota's population in the relevant time period. *Compare* https://mn.gov/admin/assets/Nursing-Home-Growth-in-1970s-Largely-Due-to-Increase-in-Population-85-Years-and-Over-MSDC-Dec1983_tcm36-76730.pdf, at 1 (showing 44,553 nursing home residents in 1980) and https://www2.census.gov/library/publications/decennial/1980/volume-1/minnesota/1980a_mnabc-01.pdf, at 25-7 (showing statewide population of 4,075,900 in 1980).

to argue that they have been unfairly targeted by generally applicable industry regulation.

#### 4. No Case Law Requires A Court To Balance A Law's Stated Purpose Against Other Potential Societal Interests

The District Court invented a wholly unfounded means of determining whether a law serves a broad societal interest by looking to whether the Council considered potential adverse effects alongside the need to establish drivers' minimum labor protections. *See* Opinion at 36-37. No case law requires a balancing of other purported societal interests against a law's stated purpose to determine whether a broad societal interest is served; the Court certainly cited none. Such requirement is invented from whole cloth.

## IV. LL 52 USES REASONABLE AND NECESSARY MEANS TO ADDRESS THE HARMS ESTABLISHED BY THE RECORD

The last prong of the Contract Clause analysis requires that the court evaluates whether "the means chosen are reasonable and necessary to meet the stated legitimate public purpose." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 369 (2d Cir. 2006). This analysis includes, *inter alia*, assessing whether the record supports the means chosen by the legislature. *See REBNY*, 182 F.4th at 166. Here, the District Court properly found that "the record [...] supports additional notice and review directed at whether the service accurately and fairly determined that a driver committed the alleged misconduct[.]" Opinion at 42. But the District Court erred

when it failed to apply the appropriate level of deference, incorrectly finding that the record did not "justify authorizing a factfinder to reassess Plaintiffs' training, operating policies, and disciplinary judgments, mandating reinstatement for procedural violations notwithstanding just cause, or reopening seven years of completed decisions[.]" *Id*. at 40.

As this Court has cautioned, applying inappropriately high scrutiny in a Contract Clause analysis would "harken a dangerous return to the days of *Lochner v. New York* [...] in which courts would act as superlegislatures," overturning legislation that they found unwise and putting the legislature in a "philosophical and economic straightjacket." *Buffalo Teachers*, 464 F.3d. at 371 (citation omitted). Rather, when assessing whether legislative interventions are reasonable and necessary, "substantial deference is accorded [...] to the legislature's judgment[s] as to the necessity and reasonableness of a particular measure[.]" *Id.* at 369 (citations and quotations omitted).

### A. Statutes Routinely Authorize Factfinders To Review Training And Policies When Determining Whether Workers Were Discharged For Just Cause

Oversight of company training and disciplinary procedures is an uncontroversial component of just cause standards, ensuring that personnel policies are applied evenly, and workers are not discharged for arbitrary or discriminatory reasons. Such standards are routinely part of collective bargaining agreements, and have been codified in statutory schemes. *See Fired with No Reason, No Warning,*

*No Severance: the Case for Replacing At-Will Employment with a Just Cause Standard,* National Employment Law Project (2022), https://www.nelp.org/app/uploads/2022/12/2022-Just-Cause-Survey-Report-FINAL3.pdf; NYC Admin. Code § 20-1272(b)(3) (looking to whether an employer's rule that is the basis for discharge was "reasonable"); 24 V.I.C. § 76 (enumerating good cause grounds for discharge, including "disobeys reasonable and lawful rules" of the employer); Mont. Code Ann. § 39-2-903 (defining "good cause" as "any reasonable job-related grounds for an employee's dismissal" based upon specific enumerated grounds).

Here, the District Court acknowledged the existence of arbitrary firings, then incorrectly suggested that this did not justify oversight of "training, operating policies, and disciplinary judgments." Opinion at 40. Yet the District Court noted that the provisions disapproved of would allow a factfinder to hold that a High-Volume Service lacked just cause when it "adopted an unreasonable policy or selected a disproportionate sanction," Opinion at 41. This outcome is precisely the kind of intervention that would prevent arbitrary firings, and mirrors existing just cause standards.

### B. LL 52 Resembles Current TLC Processes, Which Balance Drivers' Right To Their Livelihoods With Public Safety

Before Uber and Lyft's emergence as dominant market shareholders, driver discipline was largely resolved through TLC prosecution at the Office of

Administrative Trials and Hearings ("OATH"). When a driver is charged with certain crimes, TLC summarily suspends the driver's license pending resolution of the criminal charges. 35 R.C.N.Y. § 68-15(d). Even where there are not criminal charges, TLC can suspend a driver's license pending resolution of serious charges in its discretion where, *inter alia*, the TLC determines that continued licensure would constitute a direct and substantial threat to public health and safety. 35 R.C.N.Y. § 68-15(a). This Court has reviewed the adequacy of TLC's summary suspension process in extensive litigation. *See Nnebe*, *supra*, 931 F.3d 66; *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011). To be sure, LL 52 allows High-Volume Services more leeway than TLC has under *Nnebe* to keep drivers out of work, by allowing the companies to initially designate which allegations constitute egregious misconduct. Unlike in *Nnebe,* the party limiting a driver's ability to work here is a company and not the state. However, Uber and Lyft have dominated the FHV market; loss of access to their platforms effects a loss of livelihood tantamount to license revocation. LL 52 applies a similar and reasonable balance to regulating economic and public safety issues in the private sector by following similar procedures when determining whether drivers should be deprived of their livelihoods. This Court did not envision a parade of horribles related to public safety in requiring such balance in *Nnebe*; nothing about the private nature of driver discipline here changes the reasonableness of *Nnebe*'s public safety analysis.

When TLC prosecutes drivers it bears the burden of proof, 48 R.C.N.Y. § 6-12(a), just as Plaintiffs-Appellees do under LL 52. This may include having complainants testify about the events they allege support the revocation of a driver's license. Despite this well-established process–which aligns with legal proceedings more broadly–the District Court erroneously suggests that "the prospect of being called before bodies of inquiry pursuant to the Law would discourage survivors from lodging meritorious complaints against drivers[.]" Opinion at 37-38. Yet proving customer complaint violations at OATH witnesses already requires witnesses to testify, an uncontroversial proposition. *See* 48 R.C.N.Y. §§ 1-46, 6-11(d)-(e). Further, this Court has reviewed TLC's summary suspension process, which allows testimony regarding the "facts underlying a criminal complaint" and found that because the "the private interest at stake . . . is enormous" a meaningful hearing process was required. *Nnebe*, 931 F.3d at 66, 86; 83 (internal citations omitted). This was not outweighed by the interest in ensuring the "safety of the taxi-riding public and maintaining the public's trust in the safety of taxis," even where drivers were charged with crimes. *Id.* at 85-86. Accordingly, the District Court erred when it suggested that LL 52's requirement for testimony before fact-finders was unreasonable and would make the public less safe.

### C. Reinstatement Is A Reasonable Remedy Where The Companies Failed To Provide Adequate Notice

The District Court takes issue with provisions of LL 52 that require reinstatement of a driver where the company failed to provide a notice within the required timeframe or failed to provide a sufficiently detailed notice, even where a company had just cause. Opinion at 41-42. Yet as the District Court repeatedly finds, "[t]he record supports requiring meaningful notice[.]" Opinion at 42. Requiring that a party take timely action to preserve substantive rights is not a novel requirement in legal proceedings. Here, the companies have already determined that they have reason to deactivate a driver; before deactivation, they simply must provide that reasoning to the driver. There's no reason why such notice shouldn't be provided on time. If notice was "insufficiently detailed," Opinion at 42, nothing in the statute prevents companies from amending and reissuing a notice—just as a plaintiff may amend a timely-filed complaint. This accords with widely accepted legal procedures and is far from unreasonable.

### D. Providing Relief To Previously Deactivated Drivers Is A Reasonable Remedy For The Harm Of Prior Unjust And Arbitrary Deactivations

The District Court erroneously argues that the reinstatement remedy for prior deactivation is irrational because it "may make reinstatement turn on missing evidence rather than the wrongfulness of the original decision because it requires Plaintiffs to defend completed deactivations under late-created substantive standards." Opinion at 42. Yet the record supports that Uber not only acknowledged

the insufficiencies in its deactivation process, but invited the review of old cases. Uber's representative admitted that parts of Uber's deactivation "processes weren't great early on[,]" Transcript at 161:5-6, and testified that, "if there are old cases if someone feels comfortable talking to me … I would love to [...] look into those cases and [...see] if that case deserves to have another hearing." Transcript 178:25-179:7. Given this testimony, the argument that Uber lacks sufficient information to review previous deactivations is not credible; reinstatement is an appropriate remedy for drivers subject to prior deactivations, whose experiences and testimony were the catalyst for recognizing the immense harm caused by unfair, arbitrary, and wrongful deactivations.

### E. The Record Is Plain That Wrongful Deactivations Devastate Low-Wage Workers, While Uber And Lyft Are Well-Situated To Absorb Any Costs Of LL 52

Incredibly, the District Court finds that "[a]lthough the legislative record documents drivers' economic vulnerability, it does not show that the Council considered whether Plaintiffs were financially better positioned to absorb or reallocate the particular burdens imposed by the Law." Opinion at 43. That the District Court could posit this as any sort of rational comparison of drivers—low-wage workers making the equivalent of minimum wage—to companies with multibillion dollar net worths, defies belief. Uber's 2026 revenue is currently $53.7 *billion* dollars; Lyft, while much smaller, *still* has earned revenue figuring in the

several billions at $6.5 billion dollars. *See* Uber Profile, FORBES, https://www.forbes.com/companies/uber/ (Accessed: Sept. 17, 2026); Lyft Profile, FORBES, https://www.forbes.com/companies/lyft/ (Accessed: Sept. 17, 2026). Meanwhile, high-volume for-hire vehicle drivers are paid at a rate keyed to the minimum wage. *See* Statement of Basis and Purpose of Rules (Adopted Dec. 4, 2018) at 3, https://www.nyc.gov/assets/tlc/downloads/pdf/driver_income_rules_12_04_2018.pdf. There is simply no question that High-Volume Services are better positioned to shoulder any costs than the workers they pay minimum wage rates.

### F. Despite The District Court's Speculation, LL 52 Will Likely Make New York City Safer, As Adequate Training, And Clear Workplace Policies Create Demonstrably Safer Workplaces

The District Court makes much of the safety concerns LL 52 allegedly creates and repeatedly references the alleged safety risks of LL 52 when assessing irreparable harm. Opinion at 2; *see also* Opinion at 37, 45-46, 48-49.

The District Court errs by taking Plaintiffs-Appellees' allegations at face value. Importantly, LL 52 allows High-Volume Services to immediately deactivate drivers who they allege engaged in egregious misconduct, without oversight of the initial designation. Further, just because a driver is accused of unsafe conduct does not mean that they have committed it. As this Court has found, and as the TLC has previously testified, the percentage of drivers who were ultimately convicted after

having their licenses suspended was "very low" *Nnebe*, 644 F.3d at 152; over 75% of drivers whose TLC licenses were summarily suspended because of criminal charges were ultimately reinstated. *Nnebe*, 931 F.3d at 84-85.

Contrary to the District Court's assertions, LL 52 is likely to make New York City streets safer. A study found that workers engaging in "gig work" report unsafe behavior at work, like speeding and driving through red lights, due to "platform-imposed time pressure and performance incentives." *See* International Brotherhood of Teamsters - Local 804, *The Last Mile in New York City*, at 22 (internal citations omitted), available at https://assets.nationbuilder.com/teamsters804/pages/2017/attachments/original/1775246154/The_Last_Mile_In_New_York_City_v2FINAL.pdf?1775246154. While this study concerned delivery workers, drivers face similar pressures; multiple drivers testified that they feared retaliation if they did not follow customers' demands to make, *e.g.*, illegal U-turns. Transcript at 137:12-14; 185:12-19. Meanwhile, it is well-established that increased training reduces accidents. *Id.* at 20, citing findings from the Occupational Health and Safety Administration. Similarly, it is "the shared sense of whether management backs up its safety commitments with actual practice [...] that most strongly predicted whether accidents and injuries actually occurred" when compared to other factors like individual knowledge and situational factors. *Id*. at 27. Collectively, these findings suggest that LL 52—which

mandates trainings as well as clear procedures and a process for ensuring High-Volume Services consistently apply said procedures—would reduce unsafe driving.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court reverse and vacate the District Court's decision to grant Plaintiffs a preliminary injunction.

Dated: September 21, 2026
Long Island City, NY

Respectfully submitted,

*/s/ Allison Langley*
Allison Langley, Esq.
Zubin Soleimany, Esq.
New York Taxi Workers Alliance
31-10 37th Ave, Suite 300
Long Island City, NY 11101
Tel. (929) 274-3673
alangley@nytwa.org
zsoleimany@nytwa.org

*Attorneys for Advocate Amici*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 29 of the Federal Rules of Appellate Procedure and Second Circuit Local Rule 29.1, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 29(a)(5) and Local Rule 29.1(c).

This brief complies with the typeface requirements of Rule 32(a)(5) and (6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman Font.

As measured by Microsoft Word, this brief contains 6,854 words, excluding the parts of the brief exempted in Rule 32(f).

Dated: September 21, 2026
Long Island City, NY

*/s/ Allison Langley*
Allison Langley, Esq.
Zubin Soleimany, Esq.
New York Taxi Workers Alliance
31-10 37th Ave, Suite 300
Long Island City, NY 11101
Tel. (929) 274-3673
alangley@nytwa.org

*Attorneys for Advocate Amici*

# APPENDIX

## *AMICI CURIAE* ORGANIZATIONAL STATEMENTS

1. The New York Taxi Workers Alliance ("NYTWA") is a non-profit membership-based organization consisting of New York City For-Hire Vehicle and taxicab drivers, the majority of whom drive for High-Volume For-Hire Services Uber and Lyft. The NYTWA advocates for fair working conditions for professional drivers in New York City and has long advocated for deactivated drivers; since 2016, NYTWA has fought for Uber and Lyft drivers' access to unemployment insurance in New York. One of NYTWA members' priorities has been to address High-Volume Services' deactivations of drivers without adequate notice, explanation of alleged misconduct, or a meaningful and consistently applied appeals process.

2. ALIGN: the Alliance for a Greater New York is a longstanding alliance of labor and community organizations united for a just and sustainable New York. ALIGN works at the intersection of economy, environment, and equity to make change and build movement. ALIGN's model addresses the root causes of economic injustice by forging strategic coalitions, shaping the public debate through strategic communications, and developing policy solutions that make an impact.

3. The International Brotherhood of Teamsters was founded in 1903 and represents 1.3 million hardworking people in the U.S., Canada, and Puerto Rico. Their members span a wide range of occupations, from freight drivers and warehouse staff to airline pilots, zookeepers, police officers, and public defenders.

4. Worker's Justice Project ("WJP") empowers low-wage immigrant workers to gain a voice in the workplace and build strong and economically sustainable communities through education, organizing, leadership development, and the growth of grassroots economic alternatives. WJP's Los Deliveristas Unidos ("LDU") division organizes and advocates for New York City's 85,000+ app-based delivery workers. LDU works to ensure fair wages, safe working conditions, bike and micro-mobility infrastructure, education, and

pathways to unionization for these workers who power this growing segment of NYC's economy. Through this work, LDU strives to create a more sustainable and fair delivery industry that respects the rights and dignity of all workers involved. WJP is a fiscally sponsored project of Third Sector New England, Inc.

5. Region 9A of the International Union of the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") represents 50,000 active and retired members of over 30 local unions in eastern New York (including the NYC metropolitan area, the Hudson Valley, and the Capital District area), New England, and Puerto Rico. Among them, over 20,000 Region 9A members live and work in New York City. Region 9A's membership is incredibly diverse, representing workers in wide variety of industries including manufacturing, design, gaming, legal services, child care, higher education, cultural institutions, government, and more.