# 26- 2079

**UNITED STATE COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

UBER TECHNOLOGIES, INC. AND UBER USA, LLC,

*Plaintiffs-Appellees,*

*Against*

CITY OF NEW YORK,

*Defendant-Appellant.*

*On Appeal from the United States District Court*
*for the Southern District of New York*

## BRIEF OF *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT FOR REVERSAL

Richard Blum
Rebekah Cook-Mack
The Legal Aid Society
49 Thomas Street, 5th Floor
New York, N.Y. 10013
(212) 298-5311
rblum@legal-aid.org

Nicole Salk
Sarah Dranoff
Legal Services NYC
105 Court Street, 4th Floor
Brooklyn, NY 11201
(718) 237-5544
nsalk@lsnyc.org

Counsel for Proposed *Amici Curiae*
Dated: September 20, 2026
Brooklyn, NY

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................ iii

CORPORATE DISCLOSURE STATEMENT ........................................................1

INTERESTS OF AMICI CURIAE.................................................................................2

PRELIMINARY STATEMENT .....................................................................3

ARGUMENT ..........................................................................................5

I. PLAINTIFF-APPELLEES' BUSINESS MODEL DEPENDS ON AN EXPLOITATIVE EMPLOYMENT RELATIONSHIP WITH DRIVERS ...........5

A. The Imbalance of Power Makes HVFHS Drivers Especially Vulnerable...6

B. Appellees Misclassify Their Drivers and Force Them into Adhesion Contracts ..........................................................................................7

C. Appellees' Business Model Creates Economic Precarity that Merits City Regulation ........................................................................................9

1. Drivers Face Tremendous Obstacles in Obtaining Unemployment Benefits as a Result of Appellees' Misclassification and Arbitrary Deactivations .................................................................................10

2. Arbitrary Deactivations Cause Harm Due to Job Insecurity .....................12

II. LOCAL LAW 52 SERVES A SIGNIFICANT PUBLIC PURPOSE AND FALLS WITHIN NEW YORK CITY'S ESTABLISHED REGULATORY APPROACH TO PROTECTING VULNERABLE WORKERS ........................14

A. LL52 is the Latest Step in New York City's Incremental Regulation of App-Based Transportation Services ..................................................16

B. New York City Expanded Its Human Rights Law to Extend Anti-Discrimination Protections Beyond Traditional Employees ............................19

C. The City's History of Regulating Gig Economy Industries Made Foreseeable Further Regulation of FHV Drivers ............................................21

D. The City Has Expanded Just Cause Protections to Address Public Health and Welfare .........................................................................................22

1. The United States is an Outlier in its Failure to Adopt a Broad Just Cause Standard for Workers ..............................................................22

2. The City's Just Cause Laws Protect Workers from Wrongful Termination ....23
III. LL52 DOES NOT VIOLATE THE CONTRACTS CLAUSE ....26
A. Substantial Impairment ....26
B. Legitimate Public Purpose ....27
C. Reasonable and Necessary Solution ....28
CONCLUSION ....29
CERTIFICATE OF COMPLIANCE ....31
APPENDIX ....

## TABLE OF AUTHORITIES

**Cases**

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006) ........................ 26, 27

*Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111 (2d Cir. 2000) ...19

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co*., 459 U.S. 400 (1983)...26

*Garcia v. United States*, 469 U.S. 70 (1984) ..........................................................18

*Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273 (2d Cir. 1997) ......................18

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F. Supp. 2d 324 (S.D.N.Y. 2006), *aff'd,* 725 F.3d 65 (2d Cir. 2013)............................................18

*Islam v. Cuomo*, 475 F. Supp.3d 144 (E.D.N.Y. 2020).......................................8, 10

*Liu v. Uber Techs. Inc.*, 551 F. Supp. 3d 988 (N.D. Cal. 2021).............................19

*Matter of Lowry*, 189 A.D.3d 1863 (N.Y. App. Div. 2020) *lv dismissed*, 37 N.Y. 3d 1045 (2021)..........................................................................................................8

*Real Est. Bd. of N.Y., Inc. v. City of New York,* 786 F. Supp. 3d 788 (S.D.N.Y. 2025) ..................................................................................................... 18, 27

*Real Estate Bd. of New York, Inc. v. City of New York,* 182 F.4th 140, (2d Cir. 2026) ........................................................................................................5, 26

*Rest. Law Ctr. v. City of New York*, 90 F.4th 101 (2d Cir. 2024)..................... 24, 25

*U.S. v. Estate of Romani*, 523 U.S. 517 (1998) .......................................................17

*Uber Techs., Inc. v. City of New York*, No. 26-CV-4893-GHW, 2026 WL 2110901 (S.D.N.Y. July 21, 2026) ........................................................................... passim

**Statutes**

29 U.S.C. § 157 .......... 13

29 U.S.C. § 621 .......... 13

29 U.S.C. §§ 206-07 .......... 13

29 U.S.C. §§ 2601-54 .......... 13

42 U.S.C. § 12101 .......... 13

42 U.S.C. § 2000e .......... 13

42 U.S.C. §§ 2000e-2000e-17 .......... 19

42 U.S.C. §503(a)(3) .......... 11

Fed. R. App. P. 29(a)(4)(E) .......... 2

N.Y. Exec. Law § 296-d .......... 20

N.Y.C. Admin Code § 19-502 (gg) .......... 16

N.Y.C. Admin. Code § 19-502 (g) .......... 16

N.Y.C. Admin. Code § 19-549 .......... 17

N.Y.C. Admin. Code § 8-107(23) .......... 20

N.Y.C. Admin. Code §§ 20-1531 to 20-1540 .......... 24

N.Y.C. Admin. Code §§ 20-927 to 20-936 .......... 22

N.Y.L.L §§527 .......... 11

N.Y.L.L. §§ 191-d to 191-i .......... 22

N.Y.L.L. §534 ....................................................................................................11

N.Y.L.L. 593(3) ........................................................................................... 11, 16

**Regulations**

35 R.C.N.Y. § 59.................................................................................................17

**Other Authorities**

*A Letter to Our New York City Drivers*, VIA NEWSROOM (Dec. 15, 2021) ............17

*Agreeing to Terms and Conditions,* UBER HELP .....................................................8

Arielle Pardes, *Gig Workers Are Endlessly Exploited. AI Could Make More of Us Share Their Fate*, THE GUARDIAN (June 18, 202 ...........................................9, 10

Asian Am. Legal Defense and Educ. Fund, *Deactivated Without Cause: The Data Behind Unjust Firings of Drivers* (Oct. 2025).......................................................7

CTR. FOR LAW & SOC. POLICY, *A Framework for the Gig Economy: Why We Must Protect Workers & Hold Corporations Accountable* (2024) ..............................21

David Sparks, *Encrypting Discrimination: LGBTQ+ Workers in the Gig Economy* (2024), 38 A.B.A. J. EMP. & LAB. L. 77-80 (2024) .............................................19

Esther Sternberg, *The Effects of Fear of Job Loss and What to Do About It,* PSYCHOLOGY TODAY (Feb. 7, 2025)..................................................................13

*Governor Hochul Announces Unprecedented Settlement Agreement Between NYS Department of Labor and Uber* (Nov. 2, 2023 ....................................................11

James A. Parrott & Michael Reich, *An Earnings Standard for New York City's App-based Drivers: Economic Analysis and Policy Assessment* (2018)...........6, 7

N.Y.C. Comptroller, *Open for Business: More Jobs, Restaurants, and Protections Under New York City's Fast Food Just Cause Law* 8–12 (Dec. 2025),...............24

N.Y.C. Council Comm. on For-Hire Vehicles, Comm. Rep. (Aug. 8, 2018) .........16

N.Y.C. Council Comm. on Transp. & Infrastructure, Infrastructure Div. Comm. Rep. (Dec. 18, 2025) .......... 16, 18, 24

N.Y.C. Council Comm. on Transp. & Infrastructure, Infrastructure Div. Comm. Rep. (Jan. 28, 2026) .......... 16, 18

N.Y.C. Council Comm. on Transp. & Infrastructure, Infrastructure Div. Comm. Rep. (Sept. 27, 2024) .......... 16, 18, 24

N.Y.C. Taxi & Limousine Comm'n, *2025 Annual Report* 5 (2026); *Juno Shuts Down its Operations in NYC as Wwner Gett Signs Strategic Partnership with Lyft*, TECHCRUNCH (Nov. 18, 2019) .......... 17

N.Y.S. Unemployment Ins. Appeal Bd. (UIAB) Nos. 596722-596727 (July 12, 2018) .......... 8, 10

N.Y.S. Unemployment Ins. Appeals Bd., Bench Manual: Chapter 2 Misconduct (Jan. 2020) .......... 11

NAT'L EMP'T LAW PROJECT, *Fired with No Reason, No Warning, No Severance: The Case for Replacing At-Will Employment with a Just Cause Standard* (2022) .......... 23

NYC Dep't Consumer & Worker Prot., *5-Year Report on NYC's Freelance Isn't Free Act* (Nov. 1, 2023) .......... 22

ORG. FOR ECON. CO-OPERATION & DEV. (OECD), *Competition in Labor Markets* (2020) .......... 25

Sarah A. Burgard & Sarah Seelye, *Histories of Perceived Job Insecurity and Psychological Distress Among Older U.S. Adults,* SOC'Y & MENTAL HEALTH (2016) .......... 12

UCLA LABOR CTR., *Analysis of High Volume For-Hire Vehicle Data for New York City, Selected Months*, *2019-2023* (Feb. 2023) .......... 16

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(A) and 26.1(a), no amicus curiae is owned by a parent corporation and no publicly held corporation owns more than 10% of stock in any amicus.

## INTERESTS OF AMICI CURIAE[1]

Amici are worker advocacy, civil rights and civil legal services organizations committed to ensuring economic justice for low-income New Yorkers ("Advocate Amici").[2] Advocate Amici have decades of experience representing and advocating for the rights of low-wage workers. As High-Volume For-Hire Services (HVFHS) expanded, so too did the volume of drivers they employed. Drivers increasingly turned to Advocate Amici for representation in matters concerning Plaintiff-Appellees' mobile applications. Advocate Amici have an interest in the outcome of this case because they have seen firsthand the substantial economic harms faced by for-hire vehicle (FHV) drivers leading to the enactment of Local Law 52 of 2026 (LL52). Advocate Amici are uniquely positioned to provide the Court with crucial context and background information concerning the need for LL52. We submit this brief to explain why the District Court's decision preventing the implementation of the law should be reversed.

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), Amici certify that no counsel for a party authored this brief in whole or in part and no person or entity other than Amici made any monetary contribution toward its preparation or submission.

[2] Amici include the following nonprofit organizations: Asian American Legal Defense and Education Fund, LatinoJustice PRLDEF, The Legal Aid Society, Legal Services NYC, Mobilization for Justice, National Employment Lawyers Association/New York, and New York Legal Assistance Group. Advocate Amici's organizational statements are attached as an Appendix to this brief.

## PRELIMINARY STATEMENT

In response to the steady erosion of worker protections caused by rising "gigification" of low-wage work, the New York City Council has enacted a series of laws in recent years aimed at ensuring basic rights for vulnerable workers. By establishing a floor, this legislation seeks to address the human consequences of the predatory business model exemplified by Plaintiff-Appellees and other app-based employers. LL52 brings together two strands of Council regulation: the City's longstanding close oversight of FHV operations and the imperative to protect the basic welfare of its workers. In accord with recent legislation establishing protections from termination without just cause for fast food and delivery workers, LL52 provides essential due process protections to New York City's 87,000 FHV drivers, who comprise one of the largest categories of the city's low-wage workforce.

In granting the broad preliminary injunction sought by Appellees, the court below strained to construe the law as benefitting only the modest subset of drivers who are permanently deactivated rather than all drivers working under the threat of termination without notice or process. The District Court grounded its decision in the Contracts Clause, belying a central flaw in its analysis: that FHV drivers are independent contractors invested with any power at all in Appellees' take-it-or-leave-it contracts of adhesion. Based on decades of experience as employment

advocates, Amici provide crucial context and information concerning the pressures the "gig" economy creates for low-wage workers, the policy informing LL52, and the positive impact of employment protections on both workers and employers.

In this brief, Amici explain how Appellees' business model, predicated on treating drivers as independent contractors despite their being considered employees under New York's Unemployment Insurance (UI) Law, deprives drivers of income and necessary employment protections. Working under the constant threat of arbitrary deactivation takes a material and psychological toll on drivers and their families.

Amici next explain the policy context giving rise to LL52: the City's well-established regulatory approach to protecting vulnerable workers. Through longstanding regulation of FHV services, expanded anti-discrimination and other employment protections for workers classified as independent contractors, and just cause laws extending due process protections to large and particularly exploited sectors of the City's low-wage workforce, the City seeks to ameliorate the economic harms created by the vast inequality of bargaining power intrinsic to app-based employment models. In contrast to the District Court's formulation, employment protections like LL52 advantage all workers and employers who benefit from clear and consistent rules and boundaries structuring employment

relationships. By creating a predictable and rational process governing driver deactivations, LL52 serves a significant public interest.

## ARGUMENT

### I. PLAINTIFF-APPELLEES' BUSINESS MODEL DEPENDS ON AN EXPLOITATIVE EMPLOYMENT RELATIONSHIP WITH DRIVERS

Since they began operations in New York City (Uber in 2011 and Lyft in 2014), the power imbalance between Plaintiff-Appellees (the HVFHS) and their economically precarious driver workforce has left drivers subject to the control of the HVFHS and often unable to defend themselves against false accusations. The City is broadly committed to addressing this power imbalance. *See, e.g., Real Estate Bd. of New York, Inc. v. City of New York,* 182 F.4th 140, 167-68 (2d Cir. 2026) (REBNY) (in determining which party bears the burden of contractual impairment, finding the City Council's decision to reallocate the economic burden of broker fees onto landlords reasonable given their greater bargaining power). When New York City passed LL52 to protect the largest private workforce in New York State, its Sponsor, City Council Member Shekar Krishnan referenced this imbalance:

> ....Uber and Lyft hold all the power over their drivers, drivers that make them a billion-dollar corporation. And in a matter of seconds, with no notice, no opportunity to be heard, Uber and Lyft can strip the

> livelihood of drivers, the vast majority of whom are immigrants and people of color.

Ex. K, Riggs Decl. in Opp'n to Mot. for Prelim. Inj., No. 1:26-cv 04893 (S.D.N.Y. June 25, 2026), ECF No. 26-11 at 5-6. The District Court failed to comprehend the City's pressing public interest in regulating a relationship that is akin to that of David and Goliath.

### A. The Imbalance of Power Makes HVFHS Drivers Especially Vulnerable

The HVFHS are multinational companies grossing billions in revenue and are the largest private employers in New York State, with approximately87,000 drivers who work for one or both companies. *See Uber Techs., Inc. v. City of New York*, No. 26-CV-4893-GHW, 2026 WL 2110901, at *1-2 (S.D.N.Y. July 21, 2026); *see also* James A. Parrott & Michael Reich, *An Earnings Standard for New York City's App-based Drivers: Economic Analysis and Policy Assessment* (2018) 6, 15, https://a860-gpp.nyc.gov/concern/parent/jm214q59v/file_sets/zc77sr458.

FHV drivers are among the most economically precarious workers in our society. Ninety percent of Appellees' drivers are immigrants. *See* Parrott & Reich, *supra,* at 15. Only 17% have a four-year college degree and most face restricted labor market opportunities. *Id.* at 16-17. Sixty to 65% are full-time without another job, and about 80% acquired a car to earn a living by driving. *Id.* at 15. Drivers make major investments in purchasing or leasing their vehicles and spend

significant sums on the Taxi and Limousine Commission (TLC) license and application, as well as mandatory driver training and background checks to drive in New York City.

Because the HVFHS dominate the market, drivers have limited options to replace the income lost through arbitrary deactivations and, thus, face housing and food insecurity as a result. Many provide the primary source of income for their families. *Id.* at 16. In addition to financial harm, arbitrary deactivation causes substantial emotional and psychological harm as well as the loss of dignity experienced by drivers who can no longer provide for themselves and their families. Asian Am. Legal Defense and Educ. Fund, *Deactivated Without Cause: The Data Behind Unjust Firings of Drivers* (Oct. 2025) 3, https://www.aaldef.org/press-release/aaldef-report-uber-and-lyft-deactivate-nyc-drivers-with-no-notice-nodue-process-and-no/.

### B. Appellees Misclassify Their Drivers and Force Them into Adhesion Contracts

The District Court incorrectly characterizes the drivers as “independent contractors,” thereby adopting the premise of the HVFHS’ business model, which depends on worker misclassification. In fact, in numerous decisions, New York courts and agencies have reviewed the evidence and determined Uber and Lyft drivers to be employees. *See* N.Y.S. Unemployment Ins. Appeal Bd. (UIAB) Nos.

596722-596727 (July 12, 2018), https://uiappeals.ny.gov/system/files/documents/2023/09/596722-appeal-decision.pdf; *see also Matter of Lowry*, 189 A.D.3d 1863 (N.Y. App. Div. 2020) *lv dismissed*, 37 N.Y. 3d 1045 (2021); *Islam v. Cuomo*, 475 F. Supp.3d 144, 158 (E.D.N.Y. 2020) ("the NYDOL has declared hundreds of HVFHV driver claimants to be employees").

As a part of this misclassification, Appellees force drivers to execute service agreements which are take-it-or-leave-it contracts of adhesion and thus are non-negotiable. *See* N.Y.S. UIAB. Nos. 596722-596727, *supra*, at 10-13; *see also Agreeing to Terms and Conditions,* UBER HELP, https://help.uber.com/en/driving-and-delivering/article/agreeing-to-terms-and-conditions?nodeId=44cf1f0e-27ca-4919-9621-f1321a0381c1 (last accessed Sept. 16, 2026) ("Before you drive with Uber, you need to accept the legal agreements."). The District Court misses the fundamental nature of these contracts: "by accepting the Agreement, each driver consents to Uber's deactivation rights." *Uber v. City of New York,* 2026 WL 2110901, at *2. Further, the District Court erroneously accepted the need for the Platform Access Agreements (PAAs) as one-sided contracts:

> Uber characterizes the PAA's deactivation and termination provisions as "central to the Agreement and Uber's willingness to enter into it" because Uber has to "balance competing interests, including maintaining driver access to its platform, fairness, and safe and high-

> quality experiences for riders, and its own financial interests – for example, against liability or fraud."

*Id*.

The District Court decision does not account for the complete imbalance of power between the drivers and Appellees -- the imbalance of power that LL52 directly addresses. The District Court decision normalizes exploitation by determining that requiring a fair and impartial deactivation process is not a valid public interest.

### C. Appellees' Business Model Creates Economic Precarity that Merits City Regulation

The City has an imperative to regulate the HVFHS' exploitive practices to mitigate the resulting societal harms, including difficulty in accessing New York State Unemployment Insurance (UI) benefits and lack of job security. Like other platform companies, Appellees exercise significant control over workers while denying them the protections of employee status, shifting the risks of unstable pay, unpredictable work, and arbitrary loss of livelihood onto the drivers themselves. *See* Arielle Pardes, *Gig Workers Are Endlessly Exploited. AI Could Make More of Us Share Their Fate*, THE GUARDIAN (June 18, 2026), https://www.theguardian.com/technology/2026/jun/18/ai-threatens-gig-work-rise. Given the increasing pervasiveness of the HVFVS' model—approximately 60 million Americans already perform freelance or gig work, a figure projected to

reach 86 million, or about half the workforce, by 2027—the City has compelling reason to act to protect vulnerable workers. *Id*.

#### 1. *Drivers Face Tremendous Obstacles in Obtaining Unemployment Benefits as a Result of Appellees' Misclassification and Arbitrary Deactivations*

In New York State, the HVFHS' misclassification of their workers leaves drivers more vulnerable to the impact of job loss: drivers often face substantial obstacles in receiving UI safety-net benefits after they are arbitrarily deactivated. Amici have had to engage in lengthy litigation and extensive advocacy to hold Appellees accountable to the UI system and their own workforce. *See Islam v. Cuomo*, 475 F. Supp.3d at 149-50; *see supra* N.Y.S. UIAB. Nos. 596722-596727. HVFHS drivers are considered employees under the UI Law and thus, drivers' earnings may be used to establish a UI benefit claim. *See supra* Section I.B. However, for more than 10 years, Uber misclassified its drivers and failed to pay into the UI trust fund and report drivers' earnings. *Islam*, 475 F. Supp.3d at 149-50 (finding that the New York State Department of Labor (NYDOL) had determined hundreds of Uber and Lyft drivers to be employees under the UI law and granting a preliminary injunction to, *inter alia*, apply those fact findings to future determinations). Uber began to report drivers' earnings only after November 2023, and only due to a settlement with NYDOL. *See Governor Hochul Announces Unprecedented Settlement Agreement Between NYS Department of Labor and*

*Uber* (Nov. 2, 2023), https://dol.ny.gov/news/governor-hochul-announces-unprecedented-settlement-agreement-between-nys-department-labor-and.

However, drivers whose primary employer is Lyft continue to face major hurdles and may wait more than six months to receive benefits. Based on Amicus Legal Services NYC's experience, Lyft earnings do not appear on monetary benefit determinations made by NYDOL when drivers apply for UI, indicating that Lyft is not reporting driver earnings as required. Therefore, many drivers who worked for both Uber and Lyft may receive a substantially lower UI benefit than they should. When employers fail to report earnings, the burden falls on the worker to prove their earnings and navigate the complex UI bureaucracy.[3] Thus, without ready access to the full safety net benefits to which they are entitled, the consequences of being terminated are grave for drivers.

---

[3] When they contest driver eligibility for UI benefits, the UI administrative process allows Appellees to avoid payments into the UI trust fund if they can show that a worker was terminated due to "misconduct." *See* N.Y.L.L §§527 & 593(3). In general, a showing of misconduct requires that the employer demonstrate it had a rule, that it trained on the rule, that it warned the employee they had violated the rule, that the company applied the rule consistently, and the employee violated the rule. *See* N.Y.S. Unemployment Ins. Appeals Bd., Bench Manual: Chapter 2 Misconduct (Jan. 2020), https://uiappeals.ny.gov/system/files/documents/2025/05/part-2-chapter-2-misconduct.pdf. This inquiry mirrors what LL52 requires to determine just cause in most cases. UI law also provides for independent adjudication of the employer's claim of misconduct. *See* 42 U.S.C. §503(a)(3); N.Y.L.L. §534. Thus, Appellees already participate in administrative adjudications similar to those established under LL52.

### *2. Arbitrary Deactivations Cause Harm Due to Job Insecurity*

In addition to creating grave financial, emotional and psychological harm to deactivated drivers and their families, arbitrary deactivation also creates job insecurity for the entire workforce of drivers who fear the potential loss of work without notice or an opportunity to be heard. HVFHS drivers never know when an incorrect algorithm may lead to a false accusation of fraud or a passenger will falsely accuse them of improper conduct in order to get a free ride. Perceived job insecurity – "defined broadly as the perception of being threatened by job loss or an overall concern about the continued existence of the job in the future" – has been linked to poorer mental health and has been identified as one of the key psychosocial risks in the contemporary workplace. Sarah A. Burgard & Sarah Seelye, *Histories of Perceived Job Insecurity and Psychological Distress Among Older U.S. Adults,* SOC'Y & MENTAL HEALTH (2016), https://journals.sagepub.com/doi/10.1177/2156869316679466. The lack of a fair process causes harm not only for deactivated drivers and their families: it affects all drivers in the industry.

Amici regularly see the intense levels of stress that our clients face when they have lost work or fear losing their jobs. Given the high cost of living – notably rent – in New York City, the lack of job security embedded in "at-will" employment is a major stress factor that can have a profound impact on a worker's

mental and physical health. *See* Esther Sternberg, *The Effects of Fear of Job Loss and What to Do About It,* PSYCHOLOGY TODAY (Feb. 7, 2025), https://www.psychologytoday.com/us/blog/creating-wellbeing-wherever-you-are/202502/the-effects-of-fear-of-job-loss-and-what-to-do.

In the prevailing context of at-will employment, the power imbalance significantly favors employers and leaves workers vulnerable to arbitrary and unfair dismissal. Notwithstanding the plethora of federal, state, and local laws regulating the workplace,[4] job insecurity continues to have negative consequences for the workforce and society as a whole. The threat of losing one's employment means that workers are extremely reluctant to complain about all types of workplace mistreatment, from wage theft to dangerous health and safety conditions to child labor and discrimination.

---

[4] Federal protections include the National Labor Relations Act, 29 U.S.C. § 157 (1935) (allowing workers to organize and engage in concerted activity), the Fair Labor Standards Act, 29 U.S.C. §§ 206-07 (1938) (instituting guaranteed minimum wage and right to overtime, and limiting child labor), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1982) (protecting workers from termination on the basis of race, color, sex, religion, or national origin), the Age Discrimination in Employment Act, 29 U.S.C. § 621 (1967) (prohibiting adverse action against workers on the basis of age), the Americans with Disabilities Act, 42 U.S.C. § 12101 (1990) (protecting workers with disabilities), and the Family Medical Leave Act, 29 U.S.C. §§ 2601-54 (1993) (prohibiting adverse actions against workers who need time off to care for themselves or a family member).

Several witnesses who provided testimony in favor of LL52 pointed directly to job security in their support of the bill:

- Bhairavi Desai, Executive Director of the New York Taxi Workers Alliance states:

  > Real workers' rights are enforceable, hold the company to account, and can't be taken away at the company's whim.... Drivers deserve job security that is rooted in law.
  >
  > Ex. G, Riggs Decl., ECF No. 26-27 at 10-11.

- Richard Blum of the Legal Aid Society states:

  > In our experience, one of the main challenges that low-wage workers face is lack of job security....Knowing that they could keep their jobs as long as they perform their jobs adequately would give these workers material and personal security that they lack.
  >
  > *Id.* at 62.

- Naveed Paracha, an Uber driver states:

  > We need a framework that ensures our safety, provides job security, and recognizes our significant investment in delivering quality service.
  >
  > *Id*. at 9.

Thus, job security for FHV drivers was a significant impetus for LL52.

## II. LOCAL LAW 52 SERVES A SIGNIFICANT PUBLIC PURPOSE AND FALLS WITHIN NEW YORK CITY'S ESTABLISHED REGULATORY APPROACH TO PROTECTING VULNERABLE WORKERS

The District Court's conclusion that LL52 reflects "hostility" toward Uber and Lyft rather than a legitimate public purpose cannot be reconciled with New York City's longstanding regulatory approach. For decades, the City has responded to emerging labor-market developments through incremental legislation designed to ensure that workers do not lose basic protections because of changes in business models, contractual arrangements, or formal employment classifications. LL52 represents the latest step in a broader regulatory project through which the City has addressed the distinctive vulnerabilities associated with app-based work and similar contingent labor arrangements.

New York City has: (a) progressively regulated app-based transportation services and the FHV industry as new workplace concerns emerged in the gig economy; (b) extended workplace protections to encompass independent contractors; and (c) adopted analogous protections in other gig-economy sectors, reflecting a consistent policy judgment that evolving work arrangements require safeguards against economic insecurity and arbitrary treatment. This history demonstrates not only that LL52 serves a legitimate and longstanding public purpose, but also that additional regulation in this heavily regulated field was entirely foreseeable and cannot be characterized as an effort to confer benefits on a favored private interest.

### A. LL52 is the Latest Step in New York City's Incremental Regulation of App-Based Transportation Services

The City has heavily regulated the FHV industry for decades, with additional regulations specifically applicable to HVFHS like Appellees. *See, e.g.,* N.Y.C. Admin. Code § 19-502 (g) (defining for-hire services); N.Y.C. Admin Code § 19-502 (gg) (defining high-volume hire services). While the FHV category traditionally consisted of liveries, corporate black cars, and luxury limousines, the FHV industry experienced enormous changes in 2011-2018, when licenses tripled because of the inclusion of several high-volume app-based services in FHV licenses: Juno, Via, Lyft, and Uber. *See* N.Y.C. Council Comm. on Transp. & Infrastructure, Infrastructure Div. Comm. Rep. (NYCC Comm. Rep.) at 5-6 (Sept. 27, 2024); NYCC Comm. Rep. at 4-5 (Dec. 18, 2025); NYCC Comm. Rep. at 4-5 (Jan. 28, 2026). In 2018, the City Council responded to these changes with a new subcategory, "High-Volume For-Hire Services" for TLC-licensed FHV bases that dispatch more than 10,000 trips per day. Local Law No. 149 of 2018, N.Y.C. (codified in part at N.Y.C. Admin. Code § 19-550); N.Y.C. Council Comm. on For-Hire Vehicles, Comm. Rep. (Aug. 8, 2018). Local Law 149 was part of a package of bills aimed at establishing a minimum rate, capping the number of licenses for FHVs, and mitigating environmental impacts and traffic congestion. UCLA LABOR CTR., *Analysis of High Volume For-Hire Vehicle Data for New York City, Selected Months*, *2019-2023* at 3 (Feb. 2023); *see also* N.Y.C., N.Y., Local

Law No. 150 (2018) (codified at N.Y.C. Admin. Code § 19-549) (requiring TLC to establish minimum-pay standards for drivers dispatched by high-volume FHV services and separate standards for drivers dispatched by other FHV bases). In 2021, TLC amended its rules to create a HVFHS base license. Rule of the N.Y.C. Taxi & Limousine Comm'n, effective July 30, 2021, codified in 35 R.C.N.Y. § 59. Currently, Uber and Lyft are the only companies licensed as HVFHS; other HVFHS-licensed companies like Via and Juno have since shuttered their NYC-based operations. *See, e.g.,* N.Y.C. Taxi & Limousine Comm'n, *2025 Annual Report* 5 (2026); *Juno Shuts Down its Operations in NYC as Wwner Gett Signs Strategic Partnership with Lyft*, TECHCRUNCH (Nov. 18, 2019), https://techcrunch.com/2019/11/18/juno-shuts-down-its-operations-in-nyc-as-owner-gett-signs-strategic-partnership-with-lyft/; *A Letter to Our New York City Drivers*, VIA NEWSROOM (Dec. 15, 2021), https://ridewithvia.com/news/a-letter-to-our-new-york-city-drivers.

The District Court erred in its analysis of the Council's purpose in enacting LL52. In addition to the failure to contextualize the law within the broader regulatory scheme, it also mischaracterized the legislative history and intent. The Court should interpret LL52's purpose *in pari materia*, as part of a body of law by which the City has regulated HVFHS, other FHVs, and other app-based industries. *See, e.g., U.S. v. Estate of Romani*, 523 U.S. 517, 534 (1998) (considering "the

actual measures taken by Congress [to] provide a superior insight regarding its intent"). The City of New York has consistently recognized that Appellees are part of a gig economy, and different from other FHVs. Committee reports, like those from 2024, 2025, and 2026, are "the authoritative source for finding the Legislature's intent," as they "represent the considered and collective understanding of those [legislators] involved in drafting and studying proposed legislation." *REBNY*, 786 F. Supp. 3d at 807 n.7 (S.D.N.Y. 2025) (citing *Garcia v. United States*, 469 U.S. 70, 76 (1984)).

Where the committee reports are clear, the Court need not look beyond them to discern the Act's purpose. *Id.* To the extent there is perceived "hostility" towards Uber or Lyft by individual legislators, such motivations are not dispositive and "carry little weight". *Id.* (citing *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 283 n.13 (2d Cir. 1997)); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F. Supp. 2d 324, 338 n.101 (S.D.N.Y. 2006), *aff'd,* 725 F.3d 65 (2d Cir. 2013). The District Court cherry-picks the legislative record; the proper analysis is to consider the legislative history concerning the HVFHS subcategory since 2018. *See* Sept. 27, 2024 NYCC Comm. Rep. 5-6; Dec. 18, 2025 NYCC Comm. Rep. 4-5; Jan. 28, 2026 NYCC Comm. Rep. 4-5. To create a HVFHS sub-category separate from liveries, corporate black cars, and luxury limousines, the City Council consistently considered the industry's on-demand service, volume of

rides, and precarity of workers dependent on app-based employers. As this history demonstrates, LL52 is an extension of the City's consistent approach to HVFHS since 2018. *See* Ex. E, ECF No. 26-5 at 6-7 (Sept. 2024 report discussing legislative history of HVFHS subcategory); Ex. J, ECF No. 26-10 at 5-6 (Dec. 2025 committee report similarly describing legislative history).

### B. New York City Expanded Its Human Rights Law to Extend Anti-Discrimination Protections Beyond Traditional Employees

In addition to avoiding providing UI to their workers, by misclassifying their drivers as independent contractors, Appellees circumvent anti-discrimination laws. *See supra* Section I.B. Independent contractors do not qualify for anti-discrimination protections under Title VII of the Civil Rights Act. 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"); *see e.g., Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113, 119 (2d Cir. 2000) (finding Title VII and NY State Human Rights Law protect employees, but not independent contractors). As a result, Uber and Lyft drivers who are racial minorities, LGBTQ+ or part of another protected class, have been unable to avail themselves of federal anti-discrimination protections. *See, e.g., Liu v. Uber Techs. Inc.*, 551 F. Supp. 3d 988 (N.D. Cal. 2021); David Sparks, *Encrypting Discrimination: LGBTQ+ Workers in the Gig Economy* (2024), 38 A.B.A. J. EMP. & LAB. L. 77-80 (2024). Where no federal

recourse is available, workers often seek state and local laws for workplace protections.

In response, New York City amended its anti-discrimination laws to cover workers beyond the traditional definition of "employee." As of January 11, 2020, all independent contractors and freelancers have been protected from employment discrimination and harassment under the City Human Rights Law (CHRL). Local Law No. 177 of 2019 (codified at N.Y.C. Admin. Code § 8-107(23) ("the protections of this chapter relating to employees apply to interns, freelancers and independent contractors.")). For similar reasons, New York State expanded anti-discrimination protections in the New York State Human Rights Law to include "contractors, subcontractors, vendors, consultants, or other persons providing services pursuant to a contract in the workplace." 2019 N.Y. Laws ch. 160 (codified in part at N.Y. Exec. Law § 296-d).

The amendment of the CHRL demonstrates that the City pursued a public purpose extending well beyond the interests of a few complainants. Anti-discrimination laws protect designated classes of individuals to ensure that entire groups, not merely those who have already suffered harm, can participate equally in the workplace, housing market, and other areas of public life. The CHRL amendments similarly sought to protect a broad class of vulnerable workers by

closing gaps in coverage created by a misclassification regime that had produced unjust outcomes and left many without meaningful legal protection.

LL52 advances the same objective. Just as the CHRL protects workers from discriminatory treatment, LL52 safeguards the rights of all 87,000 FHV drivers, not merely those who have already been deactivated. The District Court's characterization of the affected class as "narrow" misses the mark. The relevant class is the entire population of drivers subject to deactivation, all of whom benefit from protections against arbitrary or discriminatory termination. Accordingly, LL52 serves a broader societal interest by protecting a vulnerable workforce from arbitrary and unjust terminations.

### C. The City's History of Regulating Gig Economy Industries Made Foreseeable Further Regulation of FHV Drivers

The expansion of "gigification" to a range of industries has also expanded the exclusion of gig workers from employment-based rights and protections. CTR. FOR LAW & SOC. POLICY, *A Framework for the Gig Economy: Why We Must Protect Workers & Hold Corporations Accountable* 12-13 (2024); *see supra* Section I.C. In response to this trend, New York City enacted Local Law 140 ("Freelance Isn't Free Act"), which established and enhanced protections for freelance workers, including rights to a written contract, timely and full payment, and against retaliation. Local Law No. 140 of 2016, N.Y.C. (codified at N.Y.C.

Admin. Code §§ 20-927 to 20-936); *see also* Freelance Isn't Free Act, 2023 N.Y. Laws ch. 442 (codified at N.Y. Lab. Law §§ 191-d to 191-i) (N.Y.S. analogue to LL 140). Local Law 140 also created enforcement mechanisms, including a private right of action, monetary remedies, equitable relief, and administrative support from the NYC Department of Consumer and Worker Protection (DCWP) to facilitate resolution and provide community education and referrals. *See generally* NYC Dep't Consumer & Worker Prot., *5-Year Report on NYC's Freelance Isn't Free Act* (Nov. 1, 2023). Just as the Freelance Isn't Free Act creates substantive rights in the terms of employment and provides mechanisms for workers to enforce those rights, LL52 creates substantive rights against arbitrary firings and provides procedures and enforcement remedies. Both laws regulate the terms by which vulnerable workers in the precarious gig economy can earn a living and seek to prevent the unilateral exercise of economic power by hiring entities.

### D. The City Has Expanded Just Cause Protections to Address Public Health and Welfare

#### *1. The United States is an Outlier in its Failure to Adopt a Broad Just Cause Standard for Workers*

LL52 also advances the City's goal of expanding just cause protections to its most vulnerable low-wage workers. The District Court's analysis of the just cause standard incorporated into LL52 misapprehends the nature of the employment relationship in the U.S. and the manner in which protection against unjust

dismissal both supports public health and safety goals and provides a measure of balance to a fundamentally inequitable economic system. Unlike the job protections in over 100 countries, which mandate just cause or fair reason protection for workers, the United States adheres to an "at-will" employment model that holds as its overarching principle that an employee can be fired at any time, for any reason, or for no particular reason, so long as it is not an illegal one (such as discrimination based on one's membership in a protected class). *See* NAT'L EMP'T LAW PROJECT, *Fired with No Reason, No Warning, No Severance: The Case for Replacing At-Will Employment with a Just Cause Standard* 1-2 (2022), https://www.nelp.org/app/uploads/2022/12/2022-Just-Cause-Survey-Report-FINAL3.pdf.

### ***2. The City's Just Cause Laws Protect Workers from Wrongful Termination***

The City Council enacted the Wrongful Discharge Law, N.Y.C. Admin. Code §§ 20-1271 to 20-1275, to extend just cause termination protections to the City's fast-food workforce. The City did so "to protect vulnerable fast-food employees from the financial hardships—e.g., homelessness, food insecurity, loss of resources to pay for childcare—caused by arbitrary reductions in hours and terminations" based on legislative findings concerning abusive workplace practices and unjustified firings in the industry causing economic instability for workers.

*Rest. Law Ctr. v. City of New York*, 90 F.4th 101, 122 (2d Cir. 2024) (upholding Wrongful Discharge Law as "unexceptional exercise of the City's traditional power to regulate and define minimum labor standards."). Contrary to concerns that the law would lead to reduced employment and force businesses to close, the implementation of just cause protections has had salutary effects, including an 18% increase in hiring, reduced turnover, and an increase in fast food businesses. *See* N.Y.C. Comptroller, *Open for Business: More Jobs, Restaurants, and Protections Under New York City's Fast Food Just Cause Law* 8–12 (Dec. 2025), https://comptroller.nyc.gov/reports/open-for-business-more-jobs-restaurants-and-protections-under-new-york-citys-fast-food-just-cause-law.

Confronted with the same fundamental imbalance in the FHV industry—where Uber and Lyft could unilaterally deactivate drivers and, "in a matter of seconds," deprive them of their livelihoods—the Council reasonably applied this proven model by enacting LL52, protecting drivers against arbitrary deactivation without insulating them from legitimate discipline. *See* NYC Comm. Rep. 8–9 (Sept. 27, 2024); N.Y.C. Council, Comm. on Transp. & Infrastructure, Tr. of Minutes 4–5 (Dec. 18, 2025). The City has also enacted legislation protecting app-based delivery workers from wrongful deactivation, N.Y.C. Admin. Code §§ 20-1531 to 20-1540 (effective Jan. 17, 2027), extending just cause protections to another substantial class of app-based workers who, like fast food workers and

FHV drivers, face significant job insecurity and economic instability. Along with the Wrongful Discharge Law, these protections from unjust deactivation are "analogous to the numerous statutory measures enacted over the past century limiting employers' ability to discharge their workers." *Rest. Law Ctr. v. City of New York*, 90 F.4th at 116.

By establishing clear standards governing the treatment of workers, these laws promote fair competition among businesses, reduce uncertainty in labor markets, and encourage workforce participation. ORG. FOR ECON. CO-OPERATION & DEV. (OECD), *Competition in Labor Markets* 7-10, 36-45 (2020); *see also* U.N. Int'l Lab. Org., *The Benefits of International Labor Standards*, https://www.ilo.org/international-labour-standards/benefits-international-labour-standards (last accessed Sept. 13, 2026). They also help prevent employers from obtaining competitive advantages through noncompliance with labor and anti-discrimination requirements, thereby supporting economic productivity and market integrity. *See* OECD, *Labor Markets,* at 36-46. As with other regulatory regimes designed to establish uniform rules of conduct, these laws regulating the gig economy benefit workers, employers, and the public.

Because Appellees and other gig economy employers operating in New York's labor market have long been subject to extensive workplace regulation, additional worker-protection measures were foreseeable and cannot be

characterized as an unexpected disruption of settled contractual expectations. *See Energy Reserves Grp., Inc. v. Kansas Power & Light Co*., 459 U.S. 400, 411 (1983); *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368-89 (2d Cir. 2006). The City of New York did not enact LL52 in a regulatory vacuum, but rather as part of the City's supplementation of federal and state labor protections to address gaps affecting vulnerable low-wage workers in precarious gig economy regimes. Where the City had already regulated the terms of employment for these workers, it was foreseeable the City would also regulate unlawful terminations.

## III. LL52 DOES NOT VIOLATE THE CONTRACTS CLAUSE

In determining whether a law violates the Contracts Clause, this Court considers (1) whether the contractual impairment is substantial, (2) whether the law serves "a legitimate public purpose such as remedying a general social or economic problem," and (3) whether the means chosen to accomplish that purpose are reasonable and necessary. *REBNY,* 182 F.4th at 163. In this case, as Appellees have not met their substantial burden of proving a strong likelihood of success on any element of their Contracts Clause claim, the District Court decision should be reversed.

### A. Substantial Impairment

The gravamen of the substantial impairment test is whether the law at issue substantially upends the parties' expectations under their contracts; however, in a

heavily regulated industry, further regulation is foreseeable and the Contracts Clause "does not trump the police power of a state to protect the general welfare of its citizens." *Buffalo Teachers,* 464 F.3d at 367. As discussed in Section II above, Appellees' one-sided contracts concern employment relationships that have been heavily regulated for decades, in the context of an even more closely regulated industry. Appellees had every reason to expect further government action.

**B. Legitimate Public Purpose**

Appellees have developed and promoted the adoption of a business model that divests their workforces of basic labor rights by misclassifying drivers as independent contractors while asserting unprecedented control over the drivers' work, imposing upon them adhesion contracts that dictate terms highly favorable to the companies, and treating drivers arbitrarily without effective redress. This model creates job insecurity that pervades the driver workforce.

The City Council has pushed back against this corrosive model and sought to ensure that Appellees and similar companies pay workers decently and adhere to minimum labor standards. The Council has addressed this gross imbalance of power, similar to that between landlords and tenants in *REBNY*, by first legislating a pay standard and now establishing a requirement that drivers not be terminated arbitrarily without notice or recourse. *See REBNY,* 786 F. Supp. 3d at 816-18. On the record presented here, LL52 must be seen in the context of the larger legislative

effort for basic fairness in employment practices. What the District Court views as the sponsor's raw hostility to Appellees is better understood as an articulation of the importance of the City's exercise of its police powers to protect a beleaguered workforce, and a recognition of the uneven and undue power that Appellees hold over their drivers.

Far from benefitting only the subset of drivers who are permanently deactivated, LL52 affects the entire FHV workforce and, potentially, workers in other industries who are seeking fairer treatment, as the Council continues to address the erosion of workers' rights through emerging employment practices.

### C. Reasonable and Necessary Solution

FHV driver terminations are already subject to regulatory procedures essentially similar to those established by LL52 in the context of both UI Law and the New York City Human Rights Law. As discussed above, in UI cases where Appellees allege that drivers were terminated due to misconduct, Appellees must provide evidence before an independent adjudicator, a procedure that essentially mirrors what LL52 requires to determine just cause in most cases. Similarly, should a deactivated FHV driver file a discrimination claim under the NYCHRL, Appellees would be required to make a showing of even-handed treatment of the worker under company rules in an administrative or judicial proceeding. LL52

tracks these existing provisions and requires the same sort of rational application of rules to justify termination.

The District Court erred in its analysis of whether Appellees are better able to bear any cost under the law than their low-income immigrant driver workforce. *Uber v. City of New York*, 2026 WL 2110901, at *25-27. The burden was on Appellees to show that despite their enormous resources, drivers are better able to bear the burden of economic devastation than Appellees can bear the burden of justifying their actions. Appellees did not and could not meet that burden.

## CONCLUSION

To protect the City's ability to address the needs of its most marginalized workers, rein in abusive employment practices, and respond to a stark imbalance of power, the Court should vacate and reverse the District Court's order granting a preliminary injunction.

Dated: September 20, 2026

Respectfully Submitted,

*/s/ Nicole Salk*

Nicole Salk
Sarah Dranoff
Legal Services NYC
105 Court Street, 4th Floor
Brooklyn, NY 11201
Tel: 718-237-5544
nsalk@lsnyc.org
sdranoff@lsnyc.org

Richard Blum
Rebekah Cook-Mack
The Legal Aid Society
49 Thomas Street, 5th Floor
New York, N.Y. 10013 Tel:
(212) 298-5311
rblum@legal-aid.org
rcook-mack@legal-aid.org

Niji Jain
Asian American Legal Defense and
Education Fund
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-0603
njain@aaldef.org

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(4) and 29(b)(4) and Circuit Rule 29.1(c). It contains 5,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: September 20, 2026
Brooklyn, New York

*/s/ Nicole Salk*
Nicole Salk

# APPENDIX

## *AMICI CURIAE* ORGANIZATIONAL STATEMENTS

1. The Asian American Legal Defense and Education Fund (AALDEF) is a national civil rights organization founded in 1974 and headquartered in New York City. AALDEF serves diverse Asian communities around the country in solidarity with each other, communities of color, and marginalized groups. Community lawyering is at the heart of AALDEF's work, which combines litigation, advocacy, education, and organizing to secure human rights for all people. AALDEF's Economic Justice program works to ensure that all workers, regardless of immigration status, are paid fairly, work in safe conditions, and can advocate for better workplaces without fear of retaliation, discrimination, and exploitation. AALDEF has a particular interest in this case because app-based drivers are disproportionately immigrants and people of color, communities that AALDEF has long served, including through its 2025 report, Deactivated Without Cause: The Data Behind Unjust Firings of Drivers. Drawing from analysis of about 350 surveys of deactivated drivers, the report documented a pattern of unjust deactivations by Uber and Lyft and examined their impact on drivers' livelihoods.

2. LatinoJustice PRLDEF ("LatinoJustice") works to create a more just society by using and challenging the rule of law to secure transformative, equitable and accessible justice, by fostering leadership through advocacy and education, and by protecting the rights and interests of Latino and other communities in the areas economic justice, immigrant rights, education, voting rights, and the criminal legal system. Since its inception over fifty-four years ago, LatinoJustice has litigated numerous cases to advance the economic security of low-income, vulnerable, and immigrant workers, including, for example, Centro de la Comunidad Hispana de Locust Valley, et al., v. Town of Oyster Bay, 868 F.3d 104 (2d Cir. 2017) (affirming First Amendment right of day laborers to solicit employment on public roadways). LatinoJustice also has litigated to enforce federal, state, and local anti-discrimination laws. LatinoJustice has an interest in upholding New York City's law protecting the economic security of gig workers.

3. The Legal Aid Society is the oldest and largest provider of legal assistance to low-income families and individuals in the United States. The Society's Civil Practice operates trial offices in all five boroughs of New York City, providing

comprehensive legal assistance. The Society's Employment Law Unit represents low-wage workers in employment and other work-related matters, including unlawful terminations, claims for unpaid wages, and unemployment benefits. The Society regularly represents workers who have lost their jobs due to unlawful discrimination or retaliation for having complained about unlawful practices, and the Society advises and represents workers who have tolerated abusive and exploitative conditions because of a fear of being terminated if they complain. From this work, the Employment Law Unit regularly sees the harm that arbitrary terminations inflict on our clients and their families and friends and the importance of having a process to challenge these terminations. The Society has also opposed misclassification of drivers and delivery workers who work for high-volume for-hire vehicle companies, such as Uber and Lyft, co-authoring with Legal Services NYC, among others, a successful amicus brief to the New York Court of Appeals on the question of employee status of Postmates delivery workers under the State's Unemployment Insurance Law.

4. Legal Services NYC (LSNYC) is the largest civil legal services provider in the country, with offices in the Bronx, Brooklyn, Manhattan, Queens, and Staten Island. For more than 50 years, LSNYC has provided critical legal help to low-income residents of New York City. LSNYC works to reduce poverty by challenging systemic injustice and helping clients meet basic needs for income and economic security, housing, access to high-quality education, health care, and family stability. LSNYC represents and advises low-income New Yorkers facing a range of employment issues, including unpaid wages and overtime pay, employment discrimination, medical and family leave issues, retaliation, unemployment insurance (UI) benefits, and licensing issues. LSNYC has a long history of advocacy supporting the rights of for-hire vehicle (FHV) drivers, notably in challenging misclassification by app-based employers resulting in the unfair denial or reduction of UI for eligible drivers. In 2020, LSNYC and the New York Taxi Workers Alliance sued the New York State Department of Labor to secure UI benefits for FHV drivers left without work or income at the height of the pandemic and facing protracted delays due to employer misclassification. The preliminary injunction won in *Islam v. Cuomo* resulted in full UI benefits for 65,000 drivers statewide. *Islam v. Cuomo*, 475 F. Supp. 3d 144 (E.D.N.Y. 2020). In collaboration with The Legal Aid Society and other advocates, LSNYC filed a successful amicus brief to the New York Court of Appeals on the question of employee status of Postmates delivery workers under the State's Unemployment Insurance Law.

5. Mobilization for Justice's (MFJ) mission is to achieve justice for all. MFJ prioritizes the needs of people who are low-income, disenfranchised, or have disabilities as they struggle to overcome the effects of social injustice and systemic racism. We provide the highest-quality free, direct civil legal assistance, conduct community education and build partnerships, engage in policy advocacy, and bring impact litigation. We assist more than 14,000 New Yorkers each year, benefitting over 24,000 in the areas of housing, foreclosure, civil, disability and aging rights, tax, consumer, employment, government benefits, immigration, and kinship care. MFJ's Workplace Justice Project provides advice, counsel and representation to workers with low incomes, including for-hire vehicle drivers, on employment problems, including unpaid wages, discrimination, and barriers to employment.

6. NELA/NY is the New York affiliate of the National Employment Lawyers Association ("NELA"), a national bar association dedicated to the vindication of the rights of individual employees. NELA is the nation's only professional organization comprised exclusively of lawyers who represent individual employees. NELA has over 4000 member attorneys and 69 state and local affiliates who focus their expertise on employee compensation and benefits, employment discrimination, and other issues arising out of the employment relationship. NELA/NY has more than 500 members and is one of NELA's largest affiliates. NELA/NY is dedicated to advancing the rights of individual employees to work in an environment that is free of discrimination, harassment, and retaliation, and where individuals are classified and paid lawfully. Our members advance these goals through representation of employees who have been victims of, among other things, misclassification, discrimination and retaliation. NELA/NY has filed numerous amicus briefs in New York State and Federal Courts. The aim of this participation has been to highlight the practical effects of legal decisions on the lives of working people.

7. The New York Legal Assistance Group (NYLAG) signs onto this brief to address an issue closely related to its mission of using the power of the law to help New Yorkers experiencing poverty or in crisis combat economic, racial, and social injustice, and to advocate for constituencies including low-wage workers in New York State. NYLAG's Employment Law Project (ELP) provides client-centered community-based legal advocacy for low-wage and immigrant workers facing exploitative labor practices, discrimination and harassment. Through court- and agency-based litigation, fierce negotiation, public education, policy advocacy and strong community

partnerships, ELP strives to build the power of working-class communities across the city.